IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

BRYCE A. NOLDE,

Defendant.

**8:24-CR-23**

**MEMORANDUM AND ORDER ON DEFENDANT'S SIX MOTIONS TO DISMISS**

Defendant Bryce A. Nolde has been charged with three counts of wire fraud affecting a financial institution. Filing 98 (Superseding Indictment). Trial is set for January 26, 2026. Filing 103. The Court presently considers six pretrial motions filed by the defendant: Filing 104 (Motion to Dismiss Count(s), Motion to Dismiss Criminal Case); Filing 112 (Motion to Dismiss Criminal Case); Filing 120 (Motion to Dismiss Criminal Case Count I); Filing 122 (Motion to Dismiss Criminal Case Count III); Filing 124 (Motion to Dismiss Criminal Case Count II); and Filing 126 (Motion to Dismiss Criminal Case). The defendant has also filed briefs in support of each motion: Filing 105 (Brief in Support of Motion to Dismiss Count(s), Motion to Dismiss Criminal Case); Filing 113 (Brief in Support of Motion to Dismiss Criminal Case); Filing 121 (Brief in Support of Motion to Dismiss Criminal Case Count I); Filing 123 (Brief in Support of Motion to Dismiss Criminal Case Count III); Filing 125 (Brief in Support of Motion to Dismiss Criminal Case Count II); and Filing 127 (Brief in Support of Motion to Dismiss Criminal Case).  For the purposes of this order, the Court will refer to the defendant's motions in the following manner: Motion 1 (Filing

1

104); Motion 2 (Filing 112); Motion 3 (Filing 120); Motion 4 (Filing 122); Motion 5 (Filing 124); and Motion 6 (Filing 126).

Motion 1 seeks to dismiss the Indictment for alleged violations of the defendant's speedy trial rights under the Speedy Trial Act and the Sixth Amendment. Motion 2 asks the Court to dismiss the Indictment and Superseding Indictment for violations of the Fifth and Sixth Amendments, attorney-client privilege, and *Brady v. Maryland*, 373 U.S. 83 (1963). Motions 3, 4, and 5 seek dismissal of Counts I, III, and II of the Indictment and Superseding Indictment, respectively, for failure to state a claim. Finally, Motion 6 seeks dismissal of the Superseding Indictment on overbreadth and vagueness grounds. The Government has responded to each of the defendant's motions. Filing 109; Filing 132. For the reasons below, all six of the defendant's motions are denied.[1]

## I. BACKGROUND

On February 20, 2024, the defendant was indicted for one count of wire fraud affecting a financial institution. Filing 1 (Indictment). He was arraigned on February 26, 2024. Filing 17 (Text Minute Entry). On October 21, 2025, the grand jury returned a Superseding Indictment charging the defendant with three counts of wire fraud affecting a financial institution. Filing 98 (Superseding Indictment). Between the defendant's arraignment on the Indictment and the return of the Superseding Indictment, the defendant has been represented by three different attorneys and his case has been continued more than 15 times. In order to properly and fully address the defendant's

---

[1] In each motion, the defendant requests that the matter be set for a hearing. Under NECrimR 12.3(e)(1), "The court determines whether an evidentiary hearing is required on a pretrial motion." Because an evidentiary hearing is unnecessary to resolve the six motions, and because the Court does not believe a hearing would be helpful to the Court in resolving these matters, the defendant's request for a hearing is denied.

arguments supporting his six motions, the Court must begin with a thorough explanation of this case's background.

## A. The Charges Against the Defendant

The Court starts with the charges against the defendant, as alleged in the Indictment and Superseding Indictment.[2] The charging documents assert that the defendant is the president and registered agent of BV Builders, LLC, (BV Builders) a Nebraska-based construction company specializing in the construction of "barndominiums" and "shouses." Filing 1 at 1; Filing 98 at 1. The Indictment contains a single count of wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343 and alleges that the defendant executed a scheme and artifice to defraud the customers, subcontractors, and suppliers of BV Builders. Filing 1 at 2. The Indictment further asserts that the scheme and artifice affected Financial Institution 1. Filing 1 at 2, 5–6. The Superseding Indictment contains the same Count I set forth in the Indictment and adds two additional counts of wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343. Filing 98 at 5. The Superseding Indictment outlines the same scheme and artifice to defraud the customers, subcontractors, and suppliers of BV Builders and alleges that the scheme also affected Financial Institution 2, as set forth in Count II, and Financial Institution 3, as described in Count III. Filing 98 at 2–5. The indictments name three victims of the defendant's alleged conduct: Victims 1 and 2, a married couple, and Victim 4. Filing 1 at 2, 5–6; Filing 98 at 5. None of the financial institutions or victims are identified by name in either indictment.

---

[2] The differences between the Indictment and Superseding Indictment are summarized in the Notice of Superseding Indictment. Filing 101. "It is well established, at least in [the Eighth Circuit Court of Appeals], that '[a]n original indictment remains pending prior to trial, even after the filing of a superseding indictment, unless the original indictment is formally dismissed.'" *United States v. Rupp*, 994 F.3d 946, 949 (8th Cir. 2021) (quoting *United States v. Yielding*, 657 F.3d 688, 703 (8th Cir. 2011)). The original Indictment has not been formally dismissed. Therefore, that Indictment remains pending, and the Court considers the defendant's motions as they apply to both the Indictment and the Superseding Indictment.

The charging documents allege that the defendant participated in the following scheme and artifice to defraud BV Builders' customers, subcontractors, and suppliers. First, the defendant through BV Builders allegedly solicited victim customers for whom BV Builders would construct barndominiums or shouses, and BV Builders accepted large payments directly from those customers or drew large amounts from construction loans that those customers held at financial institutions. Filing 1 at 2; Filing 98 at 2. Then, the defendant through BV Builders allegedly fraudulently represented to the victim customers that the funds were being used for legitimate construction purposes, including paying subcontractors and suppliers for their work on the customers' construction builds. Filing 1 at 3; Filing 98 at 2–3. Instead of paying subcontractors and suppliers with those funds, however, the defendant allegedly diverted the funds, in whole or in part, for purposes unrelated to the customers' builds. Filing 1 at 3; Filing 98 at 3. Because BV Builders allegedly failed to use its customers' funds to pay subcontractors and suppliers, construction liens were placed on the customers' properties. Filing 1 at 3; Filing 98 at 3. The indictments allege that the defendant through BV Builders would often cease work on agreed-upon construction projects, apparently leaving the customers' builds in various stages of incompletion even though BV Builders had received payments or drawn loan funds to pay for the work that should have been completed. Filing 1 at 4; Filing 98 at 3–4. The defendant through BV Builders also allegedly imposed construction liens on the properties of BV Builders' customers. Filing 98 at 4.

According to the charging documents, the defendant used interstate wire communication facilities in furtherance of the alleged scheme, communicating with customers, financial institutions, employees, subcontractors, and suppliers via text messages, telephone calls, emails, and internet messaging platforms. Filing 1 at 5; Filing 98 at 4. The defendant has pleaded not guilty to all of the charges against him.

4

### B. Procedural Background: Motions to Continue

The Court now turns to the procedural history of this case. The Court will only generally outline the procedural history in this section. Throughout the order, however, the Court will address more specific procedural events as necessary.

As the Court has already mentioned, the defendant has been represented by three different attorneys since the inception of this case. The defendant has retained all three attorneys. Attorney Robert B. Creager represented the defendant from February 22, 2024, to September 17, 2024. Filing 7; Filing 45. Attorney Carlos A. Monzon represented the defendant from September 13, 2024, to October 22, 2025. Filing 43; Filing 102 (Text Minute Entry). Finally, attorney Mark A. Rater entered his appearance on October 16, 2025, and continues to represent the defendant as of the date of this order. Filing 88.

Three different United States Magistrate Judges have supervised this case since its inception. Then-Magistrate Judge Susan M. Bazis supervised the case from the return of the Indictment on February 20, 2024, until April 10, 2024, when the case was transferred to Magistrate Judge Michael D. Nelson after Judge Bazis was appointed to be a United States District Judge. Filing 27 (Text General Order 2024-03). Judge Nelson then supervised the defendant's case until November 12, 2024, when the case was reassigned to Magistrate Judge Ryan C. Carson after he was sworn in as a United States Magistrate Judge. Filing 51 (Reassignment Order). Judge Carson continues to supervise this case as of the date of this order.

Between three defense attorneys, three magistrate judges, and both routine and case-specific progressions, much has happened in this case. The following events are the most pertinent. The defendant was arraigned on February 26, 2024, at which time he pleaded not guilty to the single count in the Indictment and was ordered released subject to conditions. Filing 17 (Text Minute

Entry); Filing 20. Judge Bazis issued a case progression order contemporaneously with the initial appearance hearing. Filing 17; Filing 18. That order did not set a trial date. Instead, it set a pretrial motion deadline of March 18, 2024, and provided that "[u]nless otherwise ordered, trial of this case will be scheduled upon the expiration of the pretrial motion deadline, or final ruling on any motions filed." Filing 18 at 1. The parties do not dispute that 22 days elapsed between the defendant's arraignment and March 19, 2024, the date that attorney Creager filed the first of two unopposed motions to extend the pretrial motion deadline. Filing 109 at 2; Filing 23 (First Unopposed Motion to Extend Pretrial Motion Deadline); Filing 25 (Second Unopposed Motion to Extend Pretrial Motion Deadline). Judge Bazis granted both of the motions and ultimately set a new deadline of June 17, 2024. Filing 24; Filing 26.

Three days before the June 17 pretrial motion deadline counsel for the Government, Assistant United States Attorney Sean P. Lynch, filed a motion for a pretrial conference pursuant to Federal Rule of Criminal Procedure 17.1. Filing 33. Judge Nelson granted the Government's motion and set a Rule 17.1 conference for June 24, 2024. Filing 35 (Text Order). During the June 24 conference, the parties and Judge Nelson discussed various issues, including the defendant's conditions of pretrial release and case progression. *See* Filing 38 (Audio File). Judge Nelson noted that the case had not yet been set for trial even though the pretrial motion deadline of June 17 had passed. Filing 38. Lynch notified Judge Nelson that the Government had recently disclosed to the defendant 17 gigabytes of discovery relating to additional anticipated victims not named in the Indictment. Filing 38. Creager then asked Judge Nelson to declare the defendant's matter a "complicated case." Filing 38; Filing 36 (Text Minute Entry). Judge Nelson granted the defendant's oral motion to declare the case complex and set the matter for a status conference. Filing 36; Filing 37. Judge Nelson did not set a trial date. The defendant was present at the June 24 conference, and

6

he agreed to the complexity designation on the record. Filing 38. Following the conference, Judge Nelson entered an order declaring the case complex pursuant to 18 U.S.C. § 3161(h)(7)(A) and (B) and setting a status conference for August 27, 2024. Filing 37 at 1.

The status conference originally set for August 27, 2024, was continued multiple times during the ensuing months. On August 26, 2024, Creager moved to continue the status conference, and Judge Nelson granted the motion and reset the conference for September 26, 2024. Filing 41; Filing 42 (Text Order). On September 23, 2024, the defendant's new attorney, Monzon, moved to continue the status conference by an hour, and Judge Nelson granted the motion and reset the conference for a different time on September 26. Filing 46; Filing 47 (Text Order). Then, on September 25, 2024, Judge Nelson continued the conference to September 27 on the Court's own motion. Filing 48 (Text Order). During the September 27, 2024, status conference, Monzon made an oral motion to continue the conference. Filing 50 (Text Minute Entry). Judge Nelson granted that oral motion and continued the conference to February 7, 2025. Filing 50. Those events repeated themselves at the February 7, 2025, status conference when Monzon made another oral motion to continue the conference. Filing 55 (Text Minute Entry). Judge Carson granted the defendant's oral motion and continued the conference to February 21, 2025. Filing 55. On February 20, 2025, Monzon moved to continue the status conference, and Judge Carson granted that motion and reset the conference for March 7, 2025. Filing 57; Filing 58 (Text Order). During the March 7 status conference, Monzon made an oral motion to continue the conference. Filing 60 (Text Minute Entry). Judge Carson granted the oral motion and continued the conference to May 6, 2025. Filing 60. Four days before the rescheduled status conference, Monzon filed a motion to continue the conference due to a family emergency for defense counsel. Filing 62. Judge Carson granted the defendant's motion and continued the status conference to June 12, 2025. Filing 63 (Text Order).

On June 12, 2025, the parties met with Judge Carson by telephone to discuss case progression and trial readiness. Filing 66 (Text Minute Entry). The defendant was present at the conference, and his attorney indicated that he was ready to set the matter for trial. Filing 66; Filing 67 (Audio File). However, the case was not immediately set for trial due to an outstanding discovery issue. Filing 66; Filing 67. The Court discusses that discovery issue in more detail in Section I.C. below. For background purposes here, the Court notes that the discovery issue involved the results of a filter review process that the Government had established to review technological devices it had seized from the defendant. The filter review process sought to identify and "filter out" any attorney-client privileged material contained on those devices. The defendant objected to the process. Judge Carson did not resolve the discovery issue during the June 12, 2025, conference because he needed more information from the parties. Filing 66. He continued the status conference to June 17, 2025, and ordered the Government to provide him with additional information prior to that conference. Filing 66. Judge Carson and the parties then reconvened on June 17 and further discussed the filter review process. Filing 68 (Text Minute Entry). Much like the June 12 conference, the June 17 conference was ultimately continued due to the lack of necessary information. Filing 68; Filing 69 (Audio File). Judge Carson continued the conference to June 26, 2025, and he ordered that Assistant United States Attorney Daniel D. Packard—the attorney who had headed the filter review process on behalf of the Government—be present at the rescheduled conference. Filing 68. Judge Carson also ordered the parties to meet and confer about a way to resolve the discovery issue prior to the rescheduled conference. Filing 68.

On June 26, 2025, the defendant, Monzon, Lynch, and Packard appeared before Judge Carson for an in-person status conference. Filing 73 (Text Minute Entry). Like the June 12 and June 16 conferences, the June 26 conference focused on the filter review issue. After lengthy discussions

with the attorneys, sometimes under seal and sometimes open to the public, Judge Carson ultimately imposed a solution to the filter review issue. Filing 73. Before concluding the hearing, Judge Carson set a telephone status conference for August 25, 2025, and indicated that he hoped the filter review issue would be fully resolved by then and a trial date could be set. Filing 73. Judge Carson discussed the defendant's speedy trial rights with the defendant on the record, and the defendant waived his right to a speedy trial. Filing 73; Filing 78 (Audio File).

On August 22, 2025, Monzon filed a motion to continue the August 25 status conference due a scheduling conflict. Filing 79. Judge Carson granted the defendant's motion, continued the conference to August 26, 2025, and ultimately held the conference on August 26. Filing 80 (Text Order); Filing 81 (Text Minute Entry). During the August 26 conference, the parties reported to Judge Carson that the filter review issue had been resolved according to the procedure imposed at the June 26 conference. Filing 81. The text minute entry from the August 26 conference indicates that the parties were ready to set the matter for trial and that a separate trial order was to be issued. Filing 81. That trial order was ultimately issued on September 2, 2025, after the parties met with Judge Carson for a telephone conference that same day. Filing 82 (Text Order Setting Telephone Conference for September 2, 2025); Filing 83 (Text Minute Entry); Filing 84 (Trial Order). The trial order set a trial date of November 4, 2025. Filing 84 at 1. An amended trial order was entered on September 11, 2025, resetting the trial for November 10, 2025. Filing 85.

On October 17, 2025, less than a month before trial was scheduled to begin, Monzon moved to withdraw as counsel for the defendant and the defendant's new counsel, Rater, filed a motion to continue the trial and extend the pretrial motion deadline. Filing 89 (Monzon Motion to Withdraw); Filing 91 (Motion to Continue Trial and Extend Pretrial Motion Deadline). The Court held a hearing on both motions on October 21, 2025. Filing 95 (Text Minute Entry). Due to technical difficulties

experienced by Monzon, the Court continued the hearing to October 22, 2025. Filing 95. Following the October 21 hearing and before the October 22 hearing, the grand jury returned the Superseding Indictment. Filing 98. At the October 22 hearing, the Court granted Monzon's motion to withdraw as counsel and Rater's motion to continue trial and to extend the pretrial motion deadline. Filing 102 (Text Minute Entry). The Court set trial for January 26, 2026, and set the pretrial motion deadline for November 5, 2025. Filing 103.

### C.  The Parties' Discussions of the Filter Review Process

Before the Court can proceed to the merits of the defendant's motions, it must address one final background aspect of this case. As the Court alluded to in Section 1.B. above, the three June 2025 status conferences shared the same focus: a discovery issue. Because one of the defendant's motions centers on that same discovery issue, the Court outlines the pertinent details below.

At the beginning of this case, law enforcement officers executed a search warrant on the defendant and seized nine devices, including multiple computers and cell phones. At some point early in the investigation of those devices, Creager notified Lynch that the devices potentially contained attorney-client privileged information. Lynch and the prosecution team immediately implemented what the parties describe as a "filter team" to review those devices for any privileged materials. The filter team was led by a "filter attorney" (Packard) and was made up of filter agents who were tasked with filtering through the nine devices, identifying privileged communications, and removing those communications from the collection of documents that would ultimately be sent to the prosecution team for review and potential use at trial. Before sending the results of the filter review to the prosecution team, however, the filter review team first presented the results to the defendant and his counsel so that they could further review the results and identify any additional documents they believed were privileged and should therefore be withheld from the prosecution

team. According to representations by Lynch and Packard, the filter team was kept entirely separate from the prosecution team. Indeed, during the June 26 status conference, Judge Carson discussed the details of the filter review process—including how the filter team searched the devices, what they were looking for, and how the results were compiled and presented to defense counsel—with Packard under seal.

The first in-depth discussion of the filter review process occurred during the June 12 status conference, when Lynch explained to Judge Carson that although Packard had sent the results of the filter (in the form of a hard drive) to Monzon at the end of April 2025,[3] Monzon had yet to review and object to any of the remaining documents. This meant that the results had not yet been given to Lynch and the prosecution team. Monzon contested the Government's need for the filter process or for any of the filtered documents, arguing that the information contained in those documents was not necessary for trial. In response to an inquiry from Judge Carson, Lynch conceded that he did not need the documents contained in the filter review to prove the Government's case at trial. However, Lynch pointed to a different case from the District of Nebraska, *United States v. Manzi*, No. 4:19-CR-3094, 2021 WL 3206829, at *2–3 (D. Neb. July 29, 2021), in support of his argument that he was entitled to view any nonprivileged documents that survived the filter review. As the Court has previously explained, the June 12 conference ended without resolution of this issue.

During the June 17 status conference, the parties primarily discussed the volume of materials provided by the Government's filter review team to Monzon and the defendant. According to Monzon, the hard drive that Packard had delivered to him contained 1.3 terabytes of material that had not been filtered for relevance, only for potential privilege. Monzon expressed concern with the

---

[3] During the later June 17 conference, it was determined that the actual date that Packard sent the filter results to Monzon was May 2, 2025. Filing 69.

amount of time it would take to review those materials to determine what, if any, documents the defendant objected to the prosecution receiving. Monzon argued that by giving him 1.3 terabytes of material, the Government was asking him to perform discovery for it. While he was explaining his concerns with the filter review results, Monzon also informed the Court that during a proffer interview on August 8, 2024, federal agents allegedly showed Creager and the defendant attorney-client privileged emails, apparently indicating that the prosecution team had premature access to the documents on the defendant's devices. Lynch responded that he did not know what documents Monzon was referring to. Lynch asked Judge Carson to set a deadline for the defendant to object to any documents contained on the hard drive. Judge Carson and the parties identified a few possible solutions to the filter review issue; however, Judge Carson ultimately continued the conference until June 26, when Packard could be present to provide more information about the filter review process.

As the Court has already noted, the June 26 status conference was an in-person hearing attended by the defendant, Monzon, Lynch, and Packard. During that hearing, Judge Carson determined that of the nine devices seized from the defendant, four had already been returned to the defendant's wife. The Government had attempted to return the remaining five devices to Creager, but Creager had apparently not collected them. Judge Carson asked Lynch to step out of the courtroom for sealed portions of the hearing. While under seal, both Packard and Monzon suggested solutions that they believed would facilitate Monzon's review of the filter team's results so that he could identify any documents that he believed were attorney-client privileged communications that should not be sent to the prosecution team. Ultimately and with all parties in the courtroom, Judge Carson imposed the following solution:

> (1) Government shall return the remaining five devices (four devices having already been returned) to the Defendant for his review of privileged documents and to do so without delay. The parties shall confer concerning any necessary stipulation on chain

of custody or other related issues post haste; (2) Defendant shall have no more than thirty (30) days after the remaining devices are released to counsel's care to review all devices and notify the government's filter attorney as to which documents he believes are subject to the attorney-client privilege; (3) The filter attorney shall then have no more than fourteen (14) days thereafter to review those designations and respond. Counsel are ordered to confer in good faith in an effort to reach resolution on any objections prior to contacting the court; (4) Defendant shall notify the court by motion no later than seven (7) days after receiving the filter attorney's response that an in camera review is necessary, with copies of the subject documents provided to [Judge Carson's] chambers by way of hand delivery or email and the government's filter attorney.

Filing 73. The Court notes that it was Monzon who requested that the remaining devices be returned to the defendant. Filing 74 (Audio File). Because Judge Carson granted Monzon's request and ordered that the five devices be returned to the defendant, Judge Carson also ordered the parties to confer "concerning any necessary stipulation on chain of custody or other related issues post haste."[4] Filing 73; Filing 78. Based on the text minute entry from the next status conference on August 26, 2025, it appears that the review and disclosure of the filter review results occurred according to the imposed procedure and without any issues or objections. Filing 81. At this time, the Court is unaware of any chain of custody stipulations, though the Court trusts the parties will comply with Judge Carson's order by the time trial starts.

## II. LEGAL ANALYSIS

With that detailed background in mind, the Court now turns to the defendant's six motions to dismiss, all of which were filed by the November 5, 2025, pretrial motion deadline. The Court will begin with Motion 1. Then, the Court will consider Motion 2. The Court will analyze Motions 3, 4, and 5 together because all three motions seek to dismiss the charges in the Indictment and/or

---

[4] This specific order regarding chain of custody stipulations was reiterated in the text minute entry for the August 26, 2025, status conference. Filing 81.

Superseding Indictment on the grounds that the charges do not state a claim.[5] Finally, the Court will examine Motion 6.

### A. Motion 1

Motion 1 is a "Motion to Dismiss on Speedy Trial Grounds pursuant to Nebraska Rule 12.3 and 18 U.S.C. [§] 1362(a)(2)."[6] Filing 104 at 1. The Court understands Motion 1 to assert two claims based on the defendant's speedy trial rights. First, the defendant alleges a speedy trial claim under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq*. Filing 104 at 1. Second, the defendant asserts a speedy trial claim under the Sixth Amendment to the United States Constitution, U.S. Const. amend. VI. Filing 104 at 1. As relief for these claims, the defendant asks the Court to dismiss the Indictment with prejudice. The Court will consider the two speedy trial claims in turn.

*1. The Speedy Trial Act Claim*

a. The Parties' Arguments

The Court starts with the defendant's claim under the Speedy Trial Act. The defendant argues that although he "was entitled to be tried within 70 days of his arraignment" pursuant to the Speedy Trial Act, that "70-day time limit for bringing Defendant to trial has expired." Filing 104 at 1; Filing 105 at 1. The defendant points out that his "70-day period began to run on February 26, 2024," when he was arraigned on the Indictment and argues that the time that has passed since that day "is far in excess of the allowable 70 non-excludable days." Filing 105 at 3, 5. The defendant identifies "multiple continuances" granted during the life of this case as the cause of the alleged

---

[5] Unlike Motions 3 and 5, Motion 4 itself does not specifically allege that it seeks to dismiss the relevant count for failure to state a claim. *Compare* Filing 122, with Filing 120 and Filing 124. However, the defendant's brief in support of Motion 4 reveals that the relief sought in Motion 4 is dismissal of Count III of the Superseding Indictment "for failure to state a claim." Filing 123 at 3.

[6] The Court assumes that the defendant is actually referring to the pertinent local rule of the District of Nebraska, NECrimR 12.3, and 18 U.S.C. § 3162(a)(2).

14

Speedy Trial Act violation. Filing 105 at 1. Specifically, the defendant takes issue with "the numerous continuances granted between June 24, 2024, and February 21, 2025." Filing 105 at 4. The defendant acknowledges that there are exceptions to the Speedy Trial Act's 70-day rule, including "ends-of-justice continuances," but he argues that "the Court's orders of August 27, 2024, September 27, 2024, and February 7, 2025" failed to include the specific findings necessary to implicate a Speedy Trial Act exception. Filing 105 at 4–5. He also argues that Judge Nelson's June 24, 2024, order declaring this case complex did not include a "thorough explanation for this designation" and therefore did "not satisfy the statutory requirements for designating a case as complex." Filing 105 at 5–6. The defendant contends that because the Court "failed to make the necessary findings to justify" these contested continuances, 242 days[7] of non-excludable time have elapsed. Filing 105 at 5–6. Due to this apparent violation of the defendant's speedy trial rights under the Speedy Trial Act, the defendant claims that the Indictment should be dismissed with prejudice. Filing 105 at 7. He further explains that "the Government's filing of a superseding indictment does not restart the Speedy Trial Act clock when, as here, the superseding indictment charges substantially the same offense as the original indictment." Filing 105 at 6.

There have been many continuances in this case, and the Court has identified those continuances in some detail in Section 1.B above. Nearly all of the continuances have been accompanied by language indicating that the time between the order granting the continuance and the next-scheduled event is "deemed excludable time in any computation of time under the

---

[7] In his brief supporting Motion 1, the defendant references 229 total elapsed days between June 24, 2024, and February 7, 2025. Filing 105 at 5 (165 days between August 27, 2024, and February 7, 2025), 6 (an additional 64 days between June 24, 2024, and August 27, 2024). However, by the Court's math, only 164 days elapsed between August 27, 2024, and February 7, 2025, resulting in a total of 228 days. The Court notes that the defendant has not included the 14 days between February 7, 2025, and February 21, 2025, in his calculation, even though he has objected to the February 7, 2024, continuance. The Court has therefore added those 14 days to the 228 days for a total of 242 contested days.

15

requirement of the Speedy Trial Act," or something to that effect. *See, e.g.*, Filing 24; Filing 42; Filing 55. The defendant does not challenge every continuance granted in this case, just those "granted between June 24, 2024, and February 21, 2025." Filing 105 at 4. And in fact, it is clear from the defendant's brief supporting Motion 1 that he does not even challenge every continuance granted between June 24, 2024, and February 21, 2025, as he makes no mention of Judge Nelson's September 23, 2024, text order continuing the status conference scheduled for September 26 by one hour, Filing 47, or Judge Nelson's September 25, 2024, text order rescheduling that same September 26 conference to September 27, Filing 48. *See generally* Filing 105. Instead, out of all the continuances granted in this case, the defendant only challenges the following four: (1) Judge Nelson's June 24, 2024, order declaring the case complex and setting a status conference for August 27, rather than a trial date, Filing 37; (2) Judge Nelson's August 27, 2024, text order continuing the status conference to September 26, Filing 42; (3) Judge Nelson's September 27, 2024, oral order continuing the status conference to February 7, 2025, Filing 50; and (4) Judge Carson's February 7, 2025, oral order continuing the status conference to February 21, Filing 55. Filing 105 at 4–5. The defendant does not challenge Judge Carson's February 20, 2025, text order continuing the status conference beyond February 21. *See generally* Filing 105.

The Government's response to Motion 1 includes a chart outlining the time elapsed in this case. *See* Filing 109 at 2. According to the Government's calculations, only 28 days of non-excludable time under the Speedy Trial Act have elapsed since the defendant was arraigned in February of 2024. Filing 109 at 1. The Government's chart indicates that 22 non-excludable days elapsed between the arraignment and Judge Nelson's June 24, 2024, order. Filing 109 at 2. The defendant does not challenge this calculation. The next period of non-excludable days identified in the Government's chart is the 6 non-excludable days that will have elapsed between June 12, 2025,

and the start of trial on January 26, 2026. Filing 109 at 2–3. The defendant also does not challenge this calculation. The Government's chart indicates that all of the days that elapsed between June 24, 2024, and June 12, 2025, were excludable under the Speedy Trial Act. Filing 109 at 2. The defendant only challenges the excludability of the 242 days between June 24, 2024, and February 21, 2025. While the Government has marked those days as excludable, the defendant argues that they are non-excludable and therefore count toward his speedy trial clock. He does not challenge the Government's determination that the days between February 21, 2025, and June 12, 2025, were excludable under the Speedy Trial Act.

Along with its speedy trial calculation discussed above, the Government also argues that Motion 1 "is wholly without merit and should be denied." Filing 109 at 1. The Government contends that the defendant cannot meet his burden to prove his statutory right to a speedy trial was violated and points out that it was the defendant who "request[ed] to designate this matter as complex." Filing 109 at 1, 3. The Government asserts that Judge Nelson informed the defendant of the consequences of designating the matter as complex, including "the speedy trial implications," and the defendant "agreed to the designation and tolling." Filing 109 at 4. Finally, the Government argues against dismissing the Indictment with prejudice even if the Court "were to find that it failed to satisfy the statutory findings" because it "would be inappropriate to deny the public and the victims[ ] the opportunity to hold the Defendant accountable for his crimes." Filing 109 at 4.

b.   Applicable Standards

"The Speedy Trial Act 'requires that trial begin within 70 days after a defendant is charged or makes an initial appearance.'" *United States v. Boyd*, 138 F.4th 1079, 1082 (8th Cir. 2025) (quoting *United States v. Lucas*, 499 F.3d 769, 782 (8th Cir. 2007) (en banc)). Under 18 U.S.C. § 3162(a)(2), an "information or indictment shall be dismissed on motion of the defendant" if the

defendant "is not brought to trial within the" 70-day time limit required by the Speedy Trial Act. "However, 'the Act recognizes that criminal cases vary widely and that there are valid reasons for greater delays in particular cases. To provide the necessary flexibility, the Act includes a long and detailed list of periods of delay that are excluded in computing the time within which trial must start.'" *United States v. Harris-Franklin*, 146 F.4th 631, 637 (8th Cir. 2025) (quoting *Zedner v. United States*, 547 U.S. 489, 492 (2006)). Those exclusions appear in 18 U.S.C. § 3161(h), and "the speedy trial clock runs only if none of § 3161(h)'s eight enumerated exclusions apply." *United States v. LaDeaux*, 152 F.4th 900, 902 (8th Cir. 2025) (quoting *Boyd*, 138 F.4th at 1082). The relevant § 3161(h) exclusion in this case is the one outlined in § 3161(h)(7)(A) and is known as an "ends of justice continuance." *See Boyd*, 138 F.4th at 1082.

Under § 3161(h)(7)(A), a district court may exclude:

Any period of delay resulting from a continuance granted by any judge . . . if the judge granted the continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A). Subsection (B) includes a "non-exhaustive list of factors for a district court to consider in making its ends-of-justice finding." *United States v. Grady*, 88 F.4th 1246, 1256 (8th Cir. 2023) (citing 18 U.S.C. § 3161(h)(7)(B)). One of those factors is:

Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is so unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

18 U.S.C. § 3161(h)(7)(B)(ii). Another factor is:

Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the

attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

18 U.S.C. § 3161(h)(7)(B)(iv). "For an ends of justice continuance to be proper," a court "must set forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice are served and they outweigh other interests." *Boyd*, 138 F.4th at 1082 (internal quotation marks omitted) (quoting *United States v. Johnson*, 990 F.3d 661, 667 (8th Cir. 2021)); *see also* 18 U.S.C. § 3161(h)(7)(A). "The court must make the findings, 'if only in the judge's mind, before granting the continuance.'" *Johnson*, 990 F.3d at 667 (quoting *Zedner*, 547 U.S. at 506). A district court is required "to put its 'findings on the record by the time [it] rules on a defendant's motion to dismiss under § 3162(a)(2).'" *Harris-Franklin*, 146 F.4th at 642 (quoting *Johnson*, 990 F.3d at 667).

### c.  There Has Been No Violation of the Speedy Trial Act

The defendant concedes that all four of the contested continuances—Judge Nelson's June 24, 2024, complexity designation and continuance; Judge Nelson's August 27, 2024, continuance; Judge Nelson's September 27, 2024, continuance; and Judge Carson's February 7, 2025, continuance—are "ends of justice" continuances under 18 U.S.C. § 3161(h)(7)(A). Filing 105 at 4–5. His argument is that none of those continuances were supported by "the specific, individualized findings required by the statute." Filing 105 at 5. With a 70-day time limit under the Speedy Trial Act and with a speedy trial count of 28 uncontested, non-excludable days in this case, the defendant's rights under the Speedy Trial Act are in jeopardy only if the Court finds that at least 43 additional days were also non-excludable. The Court does not make that finding here.

The Court examines the June 24, 2024, complexity designation first. Contrary to the defendant's assertions, Judge Nelson's June 24 order designating this matter as complex pursuant to 18 U.S.C. § 3161(h)(7)(B)(ii) was a valid ends of justice continuance made at the defendant's

request. The defendant argues that Judge Nelson "merely gave boilerplate language but did not state what specific reasons make this single count, single defendant indictment complex." Filing 105 at 6. This argument is without merit. After Creager asked for a complex case designation during the June 24 Rule 17.1 conference, Judge Nelson granted the request both on the record and in a written order filed the same day. Filing 36 (Text Minute Entry); Filing 37 (Order); Filing 38 (Audio File). Citing 18 U.S.C. § 3161(h)(7)(B)(ii), Judge Nelson wrote:

> The court finds from the representations of counsel for the parties that this case is so unusual and so complex due to the nature of the prosecution, the existence of novel questions of fact and law, and the amount of discovery, it would be unreasonable to expect adequate preparation for pretrial proceedings or for the trial within the time limits established by the Speedy Trial Act.

Filing 37 at 1. Judge Nelson found, therefore, that the "ends of justice ha[d] been served by granting" the defendant's request for a complex case designation and "outweigh[ed] the interests of the public and the defendant in a speedy trial." Filing 37 at 1.

The "representations of counsel for the parties" include Lynch's statements that the Government had recently disclosed to the defendant about 17 gigabytes of discovery—approximately 30,000 documents—related to other anticipated victims in the case and that Creager was apparently having issues viewing those documents. Another "representation[ ] of counsel" made during the Rule 17.1 hearing was Creager's claim that although the defendant's case involved a one-count, one-defendant indictment at the time, it was exceedingly complicated in other ways. For instance, Creager explained, the other people referenced in or connected to the 17 gigabytes of discovery could potentially be "pattern evidence," giving the defendant new grounds for pretrial motions. Creager asked for a complex case designation in this context, Judge Nelson granted the request in this context, and Judge Nelson appropriately referred to this context in his order. *See*

20

Filing 37 at 1 (identifying "the amount of discovery," among other things, as a reason for the complex case designation).

Apart from the voluminous amount of discovery in this case, Judge Nelson's order references other reasons for designating the case as complex: "the novelty and complexity of the case"; the fact that "counsel require additional time to adequately prepare the case, taking into consideration due diligence of counsel"; and the fact that failing "to grant additional time might result in a miscarriage of justice." These are all permissible reasons for granting an ends of justice continuance under 18 U.S.C. § 3161(h)(7). *See LaDeaux*, 152 F.4th at 902–03 (affirming the district court's finding that "the ends of justice were best served by the continuance based on the codefendants' need for more time to review discovery"). Considering "the record within which the continuance was granted," the "reasons for the continuance" are clear: the defendant's case was complex, not just because it involved tens of thousands of discovery documents, and additional time for pretrial and trial preparations was warranted. *Boyd*, 138 F.4th at 1082. In light of all this, Judge Nelson properly granted an ends of justice continuance on June 24, 2024.

Having addressed the propriety of the June 24 complex case designation, the Court now turns to the effect of this designation on the three remaining challenged continuances. When the defendant was arraigned in February of 2024, a trial date was not set in this matter. Instead, Judge Bazis entered an Order for the Progression of a Criminal Case setting a pretrial motion deadline of March 18, 2024, and providing that trial would be "scheduled upon the expiration of the pretrial motion deadline, or final ruling on any motions filed." Filing 18 at 1. Even with two extensions, the pretrial motion deadline had expired by the time the parties met with Judge Nelson for the Rule 17.1 conference on June 24. Thus, according to the initial progression order, a trial order should have been entered sometime in June of 2024. Judge Nelson acknowledged this fact during the June 24

21

conference but instead of setting the case for trial, he designated the case as complex and scheduled

a status conference for August 27, 2024. Filing 37 at 1; Filing 38. By granting an ends of justice

continuance under 18 U.S.C. § 3161(h)(7)—specifically an ends of justice continuance based on the

complexity of the case under subsection (B)(ii)—but not setting a trial date, Judge Nelson effectively

left the continuance open-ended.

Although the Eighth Circuit had acknowledged the existence of open-ended ends of justice

continuances in prior cases, it addressed for the first time whether such continuances are permissible

under the Speedy Trial Act in *United States v. Harris-Franklin*, 146 F.4th 631 (8th Cir. 2025). The

continuance at issue in *Harris-Franklin* was an ends of justice continuance granted by the district

court for the purpose of ensuring the defendant's newly appointed counsel had time to prepare

pretrial motions. *Harris-Franklin*, 146 F.4th at 641. The district court had first explained the need

for the continuance during a May 17, 2023, status conference after the defendant made an oral

motion for new counsel based in part on his current counsel's unwillingness to file certain pretrial

motions. *Id.* The district court noted during the hearing that any newly appointed defense counsel

would need time to prepare those motions, but the court "did not set a firm date by which the defense

must file its motions." *Id.* at 636. New counsel was appointed on May 31, and on July 11, the

defendant's new counsel filed a motion for leave to file pretrial motions. *Id.* at 641. In granting

defense counsel's motion, the court found that the time between June 1 and July 11 was excludable

time under the Speedy Trial Act because of the ends of justice continuance previously granted during

the May 17 hearing. *Id.* The defendant challenged the June 1 to July 11 continuance in a motion to

dismiss, which the court denied. *Id.* at 642. On appeal, the Eighth Circuit noted that the district court

had "left the continuance *open ended* to afford new counsel time to prepare motions and did not set

22

a new trial date." *Id.* The Eighth Circuit ultimately affirmed both the ends of justice continuance and the denial of the motion to dismiss *Id.* at 644–645.

In upholding the district court's open-ended ends of justice continuance, the circuit held that "[o]pen-ended 'continuances can be reconciled with the Speedy Trial Act provided they are not permitted to continue for an unreasonably long period of time.'" *Harris-Franklin*, 146 F.4th at 644 (quoting *United States v. Lattany*, 982 F.2d 866, 881 (3d Cir. 1992)). In other words, "open-ended continuances to serve the ends of justice are not prohibited if they are reasonable in length." *Id.* (quoting same). Considering "the particular circumstances of this case," the circuit concluded that the *Harris-Franklin* district court's 40-day continuance was "a reasonable time period" because it was necessitated by the defendant's own request for new counsel and because any new counsel would need additional time to file certain pretrial motions and to prepare for trial. *Id.* at 644 (internal quotation marks and citations omitted).

In *United States v. Grady*, 88 F.4th 1246 (8th Cir. 2023)—a case decided before the *Harris-Franklin* court assessed the propriety of open-ended continuances—the Eighth Circuit addressed ends of justice continuances that were "accompanied by no express end date." 88 F.4th at 1256. The ends of justice continuances at issue in *Grady* were imposed by the magistrate judge during the defendants' initial appearances on multiple superseding indictments. 88 F.4th at 1254. After each indictment, "the magistrate judge continued the trial, with no objections, beyond the limits imposed by the Speedy Trial Act" and she "did so based on her finding that the case was complex and therefore the ends of justice outweighed the interest in a speedy trial." *Id.* When the defendants were arraigned on a fifth superseding indictment, the magistrate judge "acknowledged her prior complexity finding" and in a subsequent order a few days later "reaffirmed the case's complexity, finding that the ends of justice necessitated continuing the trial." *Id.* Notably, the magistrate judge

did not set a date for trial when she ordered these continuances on complexity grounds, although she did eventually set deadlines for specific pretrial motion briefing. *Id.* at 1256–57 n.3 (indicating that the district court set a trial date one week after it denied the defendants motion to dismiss). The defendants eventually moved to dismiss the indictments on speedy trial grounds, but the district court denied the motion and emphasized that consistent with the magistrate judge's complexity designations, the case remained complex. *Id.*

On appeal, the Eighth Circuit upheld the *Grady* district court's ends of justice continuances based on the complexity of the case and affirmed the district court's denial of the motion to dismiss. *Grady*, 88 F.4th at 1257. The circuit acknowledged that it had not yet "addressed whether ends-of-justice continuances granted under § 3161(h)(7) may be open ended" but declined to consider the issue in *Grady* because "[t]he continuances, while accompanied by no express end date, were effectively limited in time, as they were regularly reevaluated." *Id.* at 1256. Specifically, the district court "reaffirmed the complexity, and thus the need for an ends-of-justice continuance" throughout the progression of the case. *Id.* This is distinctly different from the open-ended continuance in the later *Harris-Franklin* case, where the district court "did not reevaluate the continuance during the 40-day period" and "no progress in the case ensued until defense counsel moved for leave to file pretrial motions." *Harris-Franklin*, 146 F.4th at 643 (referencing *Grady*, 88 F.4th at 1256).

As the Court has already explained, when Judge Nelson designated this case as complex under 18 U.S.C. § 3161(h)(7), he did so without setting a trial date. Thus, there was "no express end date" to the complexity designation and its impact on the tolling of speedy trial time. *Grady*, 88 F.4th at 1256. A trial date was not set in this case until September of 2025, when the first trial order was entered. *See* Filing 84. As a result, in the days between Judge Nelson's June 24, 2024, order and the September 2, 2025, order setting a trial date, the ends of justice continuance based on the

complexity of the case remained open-ended. Unlike the open-ended continuance in *Harris-Franklin*, which the circuit evaluated under a reasonableness test, the June 24 complexity designation did not result in the cessation of progress. *See Harris-Franklin*, 146 F.4th at 643 (explaining that "no progress in the case ensued" after the district court's open-ended ends of justice continuance "until defense counsel moved for leave to file pretrial motions"). Rather, like the ends of justice continuances in *Grady*, the June 24 complexity designation was "regularly reevaluated." *Grady*, 88 F.4th at 1256. This is evidenced by Judge Nelson's decision to set the matter for a status conference, and it is further evidenced by the other three continuances that the defendant challenges.

Those three continuances—Judge Nelson's August 27, 2024, continuance; Judge Nelson's September 27, 2024, continuance; and Judge Carson's February 7, 2025, continuance—were all continuances of the *status conference* first set by the June 24 complexity order. The August 27 continuance was granted in a text order that determined "[t]he ends of justice outweigh[ed] the best interest of the public and defendant in a speedy trial." Filing 42. The September 27 and February 7 continuances were both granted on the record during the scheduled status conference and the magistrate judges in both instances determined that the time between the order granting the continuance and the new status conference date "shall be deemed excludable time in any computation of time under the requirement of the Speedy Trial Act." Filing 50; Filing 55. To the extent that the Court may not have fully articulated the bases for these continuances at the time they were granted, the Court finds the August 27, September 27, and February 7 status conference continuances were granted due to the continuing complexity of the case and counsels' need for additional time to adequately prepare the case, as first identified in the June 24 order. *See Harris-Franklin*, 146 F.4th at 642 (explaining that the district court must "put its findings on the record by the time [it] rules on a defendant's motion to dismiss under § 3161(a)(2)" (internal quotation marks

25

and citations omitted)). However, the Court concludes that the reasons for these three continuances are also clear from the record, given the initial complex case designation, the ongoing lack of a trial date, and the magistrate judges' references to the Speedy Trial Act in their orders granting the continuances.

The three other challenged continuances, then, are instances of the Court reaffirming the complexity of this case and acknowledging the need for an ends of justice continuance. *See Grady,* 88 F.4th at 1256. Thus, while the June 24 ends of justice continuance was "accompanied by no express end date," it was "effectively limited in time" because it was "regularly reevaluated" each time the Court ruled on the August 27, September 27, and February 7 motions to continue the status conference. The June 24 ends of justice continuance was also "reasonable under the particular circumstances of this case" precisely because it was reevaluated and reaffirmed on multiple occasions even beyond the challenged status conference continuances. *Harris-Franklin,* 146 F.4th at 644 (internal quotation marks and citation omitted).

Moreover, even if the Court believed that the four challenged continuances should be considered separately—rather than as reevaluations of the initial open-ended ends of justice continuance—the Court would find that all of the continuances were proper ends of justice continuances under 18 U.S.C. § 3161(h)(7). The Court has already explained that the June 24 complexity designation was a proper ends of justice continuance supported by the necessary findings under 18 U.S.C. § 3161(h)(7)(A) and (B). The three other challenged continuances were also proper ends of justice continuances in their own right because the reasons for all three continuances are clear from "the record with which the continuance[s] w[ere] granted," given the continuing complexity of the case, the lack of a trial date at the time the continuances were granted, and the magistrate judges' references to the Speedy Trial Act in granting those continuances. *Boyd,* 138

26

F.4th at 1082–83 (affirming that an ends of justice continuance granted in a "one sentence text order" was properly supported by the requisite findings after "consider[ing] the record within which the continuance was granted").

For all these reasons, the Court concludes that the time between June 24, 2024, and February 21, 2025, was excludable under 18 U.S.C. § 3161(h)(7). Accordingly, by the start of the defendant's trial on January 26, 2026, only 28 non-excludable days will have elapsed on the defendant's speedy trial clock. To the extent Motion 1 seeks dismissal of the Indictment for violations of the Speedy Trial Act, that motion is denied.

### 2. *The Sixth Amendment Claim*

#### a.  The Parties' Arguments

Motion 1 also contains a speedy trial claim under the Sixth Amendment. In asking the Court to dismiss the Indictment on "Speedy Trial grounds," the defendant argues that his "rights under the 6th Amendment to the United States Constitution were violated." Filing 104 at 1. Apart from one reference to the Sixth Amendment in Motion 1 and one reference to the Sixth Amendment in his brief supporting Motion 1, the defendant does not advance a separate argument for his constitutional speedy trial claim. Filing 104 at 1; Filing 105 at 8. As a result, the Court considers broadly whether the defendant's Sixth Amendment speedy trial rights have been violated in this case. The Government does not address the defendant's Sixth Amendment speedy trial claim in its response to Motion 1. *See generally* Filing 109.

#### b.  Applicable Standards

The Eighth Circuit has explained the following about a speedy trial claim under the Sixth Amendment:

> The Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy trial." U.S. Const. amend. VI. "Sixth Amendment challenges are reviewed separately from the Speedy Trial Act. But this court has stated, 'It would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not.'" *United States v. Aldaco*, 477 F.3d 1008, 1018–19 (8th Cir. 2007) (internal citation omitted) (quoting *United States v. Titlbach*, 339 F.3d 692, 699 (8th Cir. 2003)).

*United States v. Mallett*, 751 F.3d 907, 913 (8th Cir. 2014). "Assessment of whether a defendant's Sixth Amendment right to a speedy trial has been violated includes consideration of" four factors: "the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Johnson*, 990 F.3d at 670 (quoting *United States v. Sprouts*, 282 F.3d 1037, 1042 (8th Cir. 2002)). These are the *Barker v. Wingo*, 407 U.S. 514 (1972), factors, and the Court uses them to evaluate the defendant's Sixth Amendment speedy trial claim. *See Mallett*, 751 F.3d at 914 (identifying the *Barker* factors).

### c. There Has Been No Violation of the Defendant's Sixth Amendment Right to a Speedy Trial

First, the Court considers the length of the delay in this case. This factor "requires a double inquiry: (1) whether the length of delay was presumptively prejudicial such that it triggers the *Barker* analysis, and, if triggered, (2) the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." *Johnson* 990 F.3d at 670 (internal quotation marks and citation omitted). "As to the latter inquiry, the presumption that the pretrial delay has prejudiced the accused intensifies over time." *United States v. Maloney*, 102 F.4th 904, 917 (8th Cir. 2024) (internal quotation marks and citation omitted). The time between the defendant's February 2024 indictment and his January 2026 trial date will span approximately 23 months. The Court acknowledges that this is a lengthy delay and that is it presumptively prejudicial. *See Johnson*, 990 F.3d at 670 (holding that the defendant's "nearly 14-month delay was presumptively

prejudicial"); *see also Titlbach*, 339 F.3d at 699 ("[A] delay approaching a year may meet the threshold for presumptively prejudicial delay requiring application of the *Barker* factors."). However, the Court concludes that a 23-month delay in this case does not "stretch[ ] beyond the bare minimum needed to trigger judicial examination of the claim." *Johnson*, 990 F.3d at 670. In other words, a 23-month delay is not "uncommonly long." *United States v. Cooley*, 63 F.4th 1173, 1178 (8th Cir. 2023) (internal quotation marks and citation omitted) (holding that "[a] delay of 29 months—the total time from indictment to trial—is a lengthy but not extraordinary delay"). The Eighth Circuit "has permitted even longer delays," including delays of over 32 months, 35 months, 37 months, and 40 months. *Mallett*, 751 F.3d at 914 (citing *United States v. Summage*, 575 F.3d 864, 876 (8th Cir. 2009), for a delay of over 32 months and *Aldaco*, 477 F.3d at 1018–20, for a delay of 40 months); *United States v. Richards*, 707 F.2d 995, 998 (8th Cir. 1993) (35-month delay); *United States v. Walker*, 92 F.3d 714, 717 (8th Cir. 1996) (37-month delay). Plus, as the Court's prior discussion of the June 24 open-ended ends of justice continuance reveals, "heavy discovery in this case mitigates the delay's length." *Id.* The Court therefore turns to the second *Barker* factor.

The second *Barker* factor requires the Court to consider the reason for the delay and whether the "reason weighs in favor of a Sixth Amendment violation." *Johnson*, 990 F.3d at 671. Under this factor, the Court "evaluate[s] 'whether the government or the criminal defendant is more to blame.'" *Cooley*, 63 F.4th at 1178 (quoting *United States v. Erenas-Luna*, 560 F.3d 772, 777 (8th Cir. 2009)). "An intentional delay by the government" weighs "heavily against it." *Id.* (quoting same). "[N]egligence by the government" weighs "less heavily" but "such negligence" is still "a considerable factor in the weighing process." *Id.* (quoting same). And "delay caused by the defense" weighs "against the defendant." *Id.* (quoting same). "Delays which have been caused by the accused himself can not, of course, be complained of by him." *United States v. Williams*, 557 F.3d 943, 949

29

(8th Cir. 2009) (internal quotation marks and citation omitted). In this case, the Government's disclosure of 17 terabytes of discovery—approximately 30,000 documents—certainly contributed to the complex case designation and the ensuing delay of a trial date. The Government also initially sought the Rule 17.1 conference that ultimately resulted in the complex case designation. However, "[t]here is no evidence that the government intentionally caused any delay." *Cooley*, 63 F.4th at 1178. Rather, the delays caused by the defendant weigh heavily against him. The defendant has moved for at least 13 continuances throughout the life of this case, including seeking a continuance of his initial appearance hearing and requesting the complex case designation in the first place. The defendant moved for three continuances of the pretrial motion deadline and at least eight continuances of the status conference. He also moved to continue his trial once a trial date was set, and he changed counsel multiple times. *See Maloney*, 102 F.4th at 917 (explaining that "numerous other events played a part" in the delay in that case, "including that [the defendant] twice changed counsel and that the parties filed numerous pretrial motions"). Thus, "[a]lthough the government bears some responsibility, the blame for the majority of the pretrial delay is borne by" the defendant. *Mallett*, 751 F.3d at 914 (finding that the defendant in that case "exacerbated the delay stemming from" the Government's multiple indictments by "changing his plea, canceling his change of plea, and moving for various continuances").

Third, the Court considers "[w]hether and how a defendant assert[ed] h[is] right" to a speedy trial. *Johnson*, 990 F.3d at 671 (quoting *Barker*, 407 U.S. at 531). In reviewing the defendant's assertion of his speedy trial right, the Court takes into account the defendant's actions, including whether he sought "any relief related to it" or whether "he moved for additional continuances." *Maloney*, 102 F.4th at 918. The Court concludes that the defendant "only weakly asserted" his speedy trial right. *Johnson*, 990 F.3d at 671. Although the defendant has asserted his speedy trial

right in Motion 1, "[n]othing in the record indicates [he] acted to protect his speedy trial rights earlier." *Mallett*, 751 F.3d at 914. Instead, the record reveals that the defendant sought at least 13 continuances in this case and contributed to the delay in other ways, including by changing his counsel multiple times. The Court therefore determines that the defendant's "substantial contributions to the pretrial delay belie his later attempt[ ] to assert his speedy trial rights." *Mallett*, 751 F.3d at 914.

Under the fourth and final *Barker* factor, the Court "assess[es] the prejudice to the defendant in light of the following three interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Johnson*, 990 F.3d at 671 (internal quotation marks omitted) (quoting *Barker*, 407 U.S. at 532). The Eighth Circuit has explained that "a defendant's desire to avoid '[a]nxiety, without concurrent prejudice to the defendant's ability to mount a defense, is likely the weakest interest served [by the Sixth Amendment].'" *Maloney*, 102 F.4th at 918 (alterations in the original) (quoting *Johnson*, 990 F.3d at 671). The defendant has not shown that he was prejudiced by the pretrial delay here. Significantly, the defendant has not been incarcerated pending trial; he has been on pretrial release since his arraignment on February 26, 2024. *See* Filing 17; Filing 20. The defendant also has not argued—much less shown—that the delay has prejudiced him by causing anxiety or impairing his defense. His former counsel's argument at the June 24 Rule 17.1 conference actually suggests that the pretrial delay, to the extent it was caused by the initial complex case designation, benefited the defendant's defense, as the delay allowed defense counsel more time to review the 17 terabytes of discovery and prepare any pretrial motions based on that discovery. The "necessary ingredient" of a showing of prejudice is therefore "entirely missing here." *Mallett*, 751 F.3d at 914.

On balance, the *Barker* factors do not support a finding of a violation of the defendant's Sixth Amendment speedy trial rights. Accordingly, Motion 1 is also denied to the extent it seeks dismissal of the Indictment on Sixth Amendment speedy trial grounds.

## B.  Motion 2

Motion 2 is a "Motion to Dismiss pursuant to Rule 12.3 of the Nebraska Federal Rules of Criminal Procedure."[8] Filing 112 at 1. The defendant seeks dismissal of "the indictments with prejudice due to the government's violations of the Defendant's Fifth and Sixth Amendment rights under the United States Constitution; Brady violations under the Fifth and Fourteenth Amendment; and violation of his attorney-client privilege." Filing 113 at 13. The defendant's overarching argument in Motion 2 is that he has suffered "substantial prejudice" resulting in "violations of his constitutional rights." Filing 112 at 10. The defendant identifies three examples of that "substantial prejudice." First, he asserts that he was prejudiced by the Government's "premature and unauthorized access to privileged communications." Filing 113 at 4. The defendant specifically takes issue with the filter review process, first discussed by the Court in Section I.C. above. The defendant next argues that he was prejudiced by "the fact that the Government did not interview a named victim in the Indictment." Filing 113 at 6 (reduced from capitals). According to the defendant, the Government failed to interview Jones Bank, which the defendant believes is "Financial Institution 3" referenced in Count III of the Superseding Indictment. Filing 112 at 6. Finally, the defendant asserts that he was prejudiced by the fact that his former counsel in civil matters, the law firm of Cline Williams Wright Johnson & Oldfather (Cline Williams), apparently also "serv[ed] as counsel for" Jones Bank. Filing 112 at 4–5.

---

[8] As before, the Court assumes that the defendant is referring to NECrimR 12.3.

The Court has reviewed the defendant's allegations of "substantial prejudice" and his assertions of constitutional and other violations and has determined that Motion 2 contains three claims: (1) a Sixth Amendment effective assistance of counsel claim; (2) a Fifth Amendment due process claim; and (3) a claim of alleged *Brady* violations. The Court will consider each claim in turn.

### 1.  *The Sixth Amendment Claim*

The Court begins with the Sixth Amendment claim. "The Sixth Amendment guarantees 'the right to effective assistance of counsel.'" *Dilang Dat v. United States*, 983 F.3d 1045, 1047 (8th Cir. 2020) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)). The Eighth Circuit has recognized that the denial of a defendant's Sixth Amendment right to effective assistance of counsel may be grounds for dismissing an indictment. *See United States v. Singer*, 785 F.2d 228, 234 (8th Cir. 1986) (considering the defendant's claim that the indictment should be dismissed because of "a denial of his sixth amendment right to effective assistance of counsel"); *United States v. Hari*, 67 F.4th 903, 912 (8th Cir. 2023) (reviewing the district court's denial of the defendant's motion to dismiss the indictment on the grounds that the defendant had failed to demonstrate "a Sixth Amendment violation"). Having reviewed Motion 2 and the defendant's arguments supporting it, the Court understands the defendant to assert a Sixth Amendment effective assistance of counsel claim based on two sets of allegations: the allegations regarding Cline Williams's representation of Jones Bank and the allegations regarding the filter review process.

### a.  The Alleged Cline Williams Conflict of Interest

The Court addresses the defendant's allegations about the law firm Cline Williams first. The defendant makes the following allegations about Cline Williams: Cline Williams previously represented the defendant and BV Builders as retained counsel on civil matters involving BV

33

Builders, including "obtain[ing] construction liens against three of BV Builders' Jones Bank clients" and "sending retraction letters to" some of BV Builders' customers "for making libelous statements about [the defendant] online." Filing 112 at 4. On December 19, 2023, Cline Williams terminated its representation of the defendant and BV Builders "due to the law firm having a conflict due to Nolde's bank accounts being subpoenaed by investigators." Filing 112 at 5. The defendant suspected that Cline Williams's conflict arose from its representation of Jones Bank. Filing 112 at 5. The defendant also believes that Jones Bank is Financial Institution 3 named in Count III of the Superseding Indictment. Filing 112 at 6. The defendant notes that he "did not waive the conflict." Filing 112 at 5. By February 7, 2024, a Cline Williams attorney, "in response to a subpoena from the Nebraska Attorney General, had provided at least 5,561 records relating to Bryce Nolde and BV Builders on behalf of Jones Bank." Filing 112 at 5. Some or all of those records became part of the discovery in the present criminal case. Filing 113 at 9. Cline Williams has continued to represent Jones Bank in a civil lawsuit filed by the defendant and BV Builders in September 2025 in Seward County, Nebraska, and the defendant has moved to disqualify Cline Williams from representing Jones Bank in that civil case. Filing 112 at 5–6.

In response, the Government states that it "cannot speak to allegations by Defendant against attorneys with the law firm of Cline Williams." Filing 132 at 4. The Government does not identify Jones Bank as Financial Institution 3 in the Superseding Indictment, but it does acknowledge that "attorneys from Cline Williams facilitated Financial Institution 3's response to process served by the Government on Financial Institution 3." Filing 132 at 4–5. The Government disputes the defendant's claim that Cline Williams attorneys "coordinated with investigators." Filing 132 at 5. The Government also emphasizes that "Financial Institution 3 is not a named victim in the Superseding Indictment." Filing 132 at 4.

34

There are two ways to assess this alleged conflict of interest in the Sixth Amendment context. The first is to consider whether the defendant has established "a Sixth Amendment claim based on violation of the attorney-client privilege." *United States v. Tyerman*, 701 F.3d 552, 559 (8th Cir. 2012). The second is to consider whether the defendant has established a Sixth Amendment claim based on the conflict of interest itself. *See United States v. Agosto*, 675 F.2d 965, 969 (8th Cir. 1982) (explaining that the Sixth Amendment guarantee of the assistance of counsel for a defendant's defense "includes the right to the assistance of an attorney unhindered by a conflict of interest" (internal quotation marks omitted) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 355 (1980) (Marshall, J., concurring in part and dissenting in part))), *abrogated in part on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984). The Court concludes that the defendant has not shown a Sixth Amendment violation under either analysis.

> i. The Alleged Cline Williams Conflict Does Not Constitute a Sixth Amendment Violation Under the Attorney-Client Privilege Analysis

The Eighth Circuit has specifically examined "Sixth Amendment claim[s] based on violation of the attorney-client privilege." *Tyerman*, 701 F.3d at 559; *see also Singer*, 785 F.2d at 234 (Sixth Amendment claim based on allegations of the "government's procurement and review of the confidential attorney-client file"); *Hari*, 67 F.4th at 912 (Sixth Amendment claim based on allegations of "governmental intrusions upon attorney-client privileged materials, pertaining to defense and trial strategy"). "To establish this violation, 'a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice.'" *Hari*, 67 F.4th at 912 (quoting *Singer*, 785 F.2d at 234). The defendant "must prove an act of 'deliberate intrusion' to establish" a Sixth Amendment claim based on violation of the attorney-

client privilege. *Id.* (quoting *Tyerman*, 701 F.3d at 559). The defendant bears the burden to prove a Sixth Amendment violation. *United States v. Kriens*, 270 F.3d 597, 603 (8th Cir. 2001). And even if a defendant carries that burden, "[i]dentification of a [S]ixth [A]mendment violation alone . . . does not require dismissal of the indictment." *Singer*, 785 F.2d at 234. "Rather, the appropriate course when faced with a [S]ixth [A]mendment violation is to tailor a remedy to the injury suffered, to assure the defendant effective assistance of counsel in a subsequent proceeding." *Id.*

To the extent the defendant argues that the alleged Cline Williams conflict—including the fact that attorneys from Cline Williams "facilitated Financial Institution 3's response to process served by the Government on Financial Institution 3"—constituted a violation of his Sixth Amendment right to effective assistance of counsel based on governmental intrusion into the attorney-client relationship, that argument is without merit. *See* Filing 113 at 10 (the defendant's argument that "the use of privileged information by a former attorney against a former client, particularly when coordinated with government investigators, implicates the right to counsel and due process"). The most significant issue with a Sixth Amendment claim on this ground is that regardless of whether a conflict of interest existed, at the time the violation of the attorney-client privilege allegedly occurred here the defendant did not yet *have* a Sixth Amendment right to counsel.

The Sixth Amendment right to counsel "does not attach until a prosecution is commenced." *United States v. Waits*, 919 F.3d 1090, 1094 (8th Cir. 2019) (citing *Texas v. Cobb*, 532 U.S. 162 (2001)). Put differently, the Sixth Amendment "right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against [a defendant]." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). The Supreme Court has described "the initiation of adversary judicial criminal proceedings" as either "formal charge, preliminary hearing, indictment, information, or

arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (internal quotation marks omitted) (quoting *Kirby*, 406 U.S. at 688–89).

The grand jury returned the Indictment against the defendant on February 20, 2024. Filing 1. At that point, adversary judicial criminal proceedings initiated against the defendant. *See Gouveia*, 467 U.S. at 188. All of the defendant's allegations suggesting that the Government intruded into his attorney-client relationship with his former attorneys at Cline Williams occurred before the defendant was indicted—that is, before adversary judicial criminal proceedings had begun. The defendant states that Cline Williams terminated its representation of the defendant and BV Builders on December 19, 2023, and he alleges that Cline Williams responded to subpoenas on behalf of Financial Institution 3—which the defendant believes is Jones Bank—by February 7, 2024. Filing 112 at 4–5. It is not clear that the documents produced in response to the subpoenas were attorney-client privileged materials. In fact, one of the defendant's own exhibits suggests that the documents produced by Cline Williams on behalf of its client were "non-privileged documents." Filing 112-8 (designated "Exhibit 107" by the defendant). But even assuming for the sake of argument that some or all of the documents were privileged, the Government could not have violated the Sixth Amendment by reviewing them because those documents were produced before the Indictment was filed and therefore before the defendant's Sixth Amendment right to counsel had attached. *Waits*, 919 F.3d at 1094 ("[T]he right to counsel does not attach until a prosecution is commenced."); *see also United States v. Adams*, No. 0:17-cr-00064-DWF-KMM, 2018 WL 6991106, at *16 (D. Minn. Sept. 17, 2018) (recommending that the district court reject the defendant's claim that his Sixth Amendment right to effective assistance of counsel was violated when government attorneys viewed communications with the defendant's attorneys before the defendant had been charged or even arrested for the conduct at issue in the case); *United States v. Anderson*, No. 4:14CR00246AGF

(NAB), 2017 WL 2644324, at *4 (E.D. Mo. June 20, 2017) (concluding that " because [d]efendant has no constitutional right to effective assistance of counsel prior to the indictment, his claims based on any alleged pre-indictment conflict of interest must fail").

Accordingly, the defendant has not shown that the alleged Cline Williams conflict of interest resulted in a violation of his Sixth Amendment right to assistance of counsel under the theory of a governmental intrusion into the attorney-client relationship. *United States v. Edelmann*, 458 F.3d 791, 803 (8th Cir. 2006) ("If no right to counsel existed, no valid claim for ineffective assistance can be made.").

> ii. The Alleged Cline Williams Conflict Also Does Not Constitute a Sixth Amendment Violation Based on the Conflict Itself

The alleged Cline Williams conflict also did not result in a violation of the defendant's Sixth Amendment right to assistance of counsel based on the conflict of interest itself. The Sixth Amendment guarantees the defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. "To guarantee the effective assistance of counsel, a criminal defendant enjoys the right to be represented by counsel free from any conflicts of interest." *United States v. Poe*, 428 F.3d 1119, 1123 (8th Cir. 2005); *see also Edelmann*, 458 F.3d at 806 ("Additionally, '[t]he right to counsel's undivided loyalty is a critical component of the right to assistance of counsel; when counsel is burdened by a conflict of interest, he deprives his client of his Sixth Amendment right as surely as if he failed to appear at trial.'" (quoting *Bonin v. California*, 494 U.S. 1039, 1044 (1990))). Generally, "conflict of interest issues in criminal cases are raised at the post-conviction stage, where the inquiry focuses on whether the defendant has made a showing of harm sufficient to require reversal of his conviction." *Agosto*, 675 F.2d at 969 (citing *Cuyler*, 446 U.S. at 350). However, courts can and do consider conflict of interest issues at the pretrial stage, usually when

38

faced with a motion for the disqualification of counsel. *See id.* at 970 ("Here, we are concerned with the power of the district court to disqualify counsel before conflict results in ineffective assistance of counsel."). "At this stage in the proceedings, there is of necessity less certainty as to whether conflicts will actually arise and as to the nature of those conflicts," and the "standards applicable" to "assessing the potential for conflict" are "flexible." *Id.* "[T]he first inquiry is whether there is good cause to believe that a conflict of interest is likely to arise." *Id.* at 971.

The Eighth Circuit has identified two primary types of conflicts: "multiple representation," which occurs "when an attorney simultaneously represents clients with differing interests," and "successive representation," which occurs "when an attorney representing a defendant has previously represented codefendants or trial witnesses. *United States v. Shepard*, 675 F.2d 977, 979 (8th Cir. 1982); *see also Agosto*, 675 F.2d at 970 (describing "multiple representation" as a case "where an attorney simultaneously represents two or more defendants" and "successive representation" as a case "where an attorney representing a defendant has previously represented codefendants or trial witnesses"). "A major course of conflicts in both successive and multiple representation cases is the attorney's receipt of privileged information from a witness or codefendant." *Agosto*, 675 F.2d at 971. There are no codefendants in this case and Cline Williams has never served as criminal defense counsel for the defendant or for any non-existent codefendants, so the Court does not examine whether this is a case of multiple representation. Instead, the Court considers whether this is a case of successive representation.

Successive representation occurs "where an attorney representing a defendant has previously represented codefendants or trial witnesses." *Id.* at 970. "[T]he concern in successive representation cases is that an attorney might breach the confidentiality of the former attorney-client relationship or place his own interest in future pecuniary gain from the former client above the present client's

right to effective representation." *Cheek v. United States*, 858 F.2d 1330, 1337 (8th Cir. 1988) (citing *Agosto*, 675 F.2d at 971). Neither of these concerns are implicated by Cline Williams's former representation of the defendant and BV Builders on civil matters. As a result, the Court does not find that there is good cause to believe a conflict of interest is likely to arise. The first problem with a successive representation claim is that "the Sixth Amendment right to conflict-free representation 'is held by criminal defendants objecting to their own attorneys'" and Cline Williams has never represented the defendant in this criminal case. *United States v. Poe*, 428 F.3d 1119, 1122–23 (8th Cir. 2005) (quoting *Page v. Ark. Dep't of Corr.*, 49 Fed.Appx. 663, 665 (8th Cir. 2002) (unpublished per curiam)). The defendant has been represented by Creager, Monzon, and now Rater, and he has not claimed that any of his criminal defense attorneys have provided ineffective assistance. *See Poe*, 428 F.3d at 1123 (rejecting the defendant's argument that his codefendant's counsel, an attorney named Stratford, had a conflict of interest because Stratford had previously represented the defendant in an unrelated state criminal case six years earlier and explaining that "Stratford did not represent Poe in this case. Poe was represented by Wright then Rosenzweig. And Poe does not claim Rosenzweig provided ineffective assistance"). The defendant has not claimed that any of his criminal defense attorneys have previously represented codefendants, of which there are none. *See Agosto*, 675 F.2d at 973 (explaining that "[i]n the criminal context, disqualification on the basis of the attorney's receipt of privileged information from a codefendant formerly represented by that attorney should only be considered upon a clear showing that the present and former clients' interests are adverse"). Nor has he alleged that any of his criminal defense attorneys have previously represented anticipated trial witnesses. *United States v. Flynn*, 87 F.3d 996, 1001 (8th Cir. 1996) (rejecting the defendant's claim that his "*trial* attorney's prior representation of a government witness . . . created a conflict of interest" (emphasis added)). "Thus, the application of the Sixth

40

Amendment right to effective assistance of counsel entails the pounding of a square peg into a round hole." *Poe*, 428 F.3d at 1122.

The second problem with a successive representation claim is that even if the Court assumed for the sake of argument that the defendant could bring such a claim against counsel who has at no point represented him during this criminal case, the defendant has not alleged that that counsel has "previously represented codefendants or trial witnesses" in this criminal case.[9] *Shepard*, 675 F.2d at 979. However, the defendant does argue that Cline Williams, after terminating its representation of the defendant and BV Builders, "continued to represent Jones Bank, the alleged victim in the wire fraud counts." Filing 113 at 9. In support of his conflict-of-interest claim, the defendant points the Court to a nonbinding case from the Second Circuit Court of Appeals, *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227 (2d Cir. 2016). Filing 113 at 9. In *Prevezon Holdings*, the Second Circuit considered the district court's denial of a fraud victim's motion to disqualify counsel for multiple companies (known collectively as "Prevezon") from representing Prevezon in a civil forfeiture and money laundering action brought by the Government against Prevezon. *Prevezon Holdings, Ltd.*, 839 F.3d at 230–32. The fraud victim, Hermitage Capital Management Ltd., had previously retained the same law firm that Prevezon later hired to represent it during the civil forfeiture matter. *Id.* That law firm had represented Hermitage for approximately nine months beginning in September 2008, and Prevezon did not retain the same firm until September 2013, after the Government had filed the civil forfeiture and money laundering action against Prevezon. *Id.* at 232. During the law firm's representation of Hermitage, the firm investigated the fraud scheme—

---

[9] At this time, neither party has submitted witness or exhibit lists in preparation of trial and the Court will not speculate as to who may or may not testify. There are well established avenues for parties seeking to limit or altogether exclude evidence at trial.

which had occurred in Russia, and which had resulted in criminal charges against Hermitage in Russia—to help gather evidence for the firm to defend Hermitage in Russia and "to interest the United States government in investigating the fraud and reclaiming the fraud's proceeds." *Id.* at 231.

The district court ultimately denied Hermitage's motion to disqualify the law firm from representing Prevezon after concluding that "there was no 'substantial relationship' between the subject matter of the two representations" and that there was "no risk of 'potential taint to this [civil forfeiture] trial'" because "Hermitage was not a party to the instant litigation." *Id.* at 235. Hermitage then moved the Second Circuit for a stay of the district court's order pending appeal or in the alternative, for a petition for a writ of mandamus. *Id.* The Second Circuit granted Hermitage's petition for a writ of mandamus and instructed the district court to enter an order disqualifying the law firm from representing Prevezon in the civil forfeiture litigation. *Id.* at 242. In ruling that the law firm should be disqualified, the Second Circuit applied its "classic test" for determining "whether disqualification is warranted in successive representation cases" and considered "(1) whether the moving party is a former client of the adverse party's counsel;" (2) whether "there is a substantial relationship between the subject matter of the counsel's prior representations of the moving party and the issues in the present lawsuit;" and (3) whether "the attorney whose disqualification is sought had access to, or was likely to have had access to, the relevant privileged information in the course of his prior representation of the client." *Id.* at 239 (internal quotation marks omitted) (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)). The Second Circuit concluded that Hermitage, as "a nonparty victim," was "entitled to the same solicitude as a nonparty witness" and held that "crime victims, as well as witnesses, possess legitimate interests in criminal proceedings that may support disqualification." *Id.* at 240. The circuit further determined that a substantial relationship existed between the two representations and that "the record supports

a finding of disqualifying taint." *Id.* at 240–41. The *Prevezon Holdings* court noted that "courts will disqualify lawyers who switch sides from representing a crime victim to representing the perpetrator." *Id.* at 242.

The *Prevezon Holdings* case does not help the defendant. Unlike the district court in *Prevezon Holdings*, this Court considers a motion to dismiss the indictments on Sixth Amendment grounds—not a motion to disqualify Cline Williams from serving as counsel in this case. Indeed, the defendant could not have brought a motion to disqualify Cline Williams in this case because Cline Williams is not counsel for an adverse party *or* a victim in this case, just as Cline Williams has never served as criminal defense counsel for the defendant. *See Prevezon Holdings*, 839 F.3d at 239 (reciting the first prong of the Second Circuit's "classic test" for analyzing a successive representation claim as a consideration of whether "the moving party is a former client of the adverse party's counsel"). The Government is the only party adverse to the defendant, and the Government is represented by the United States Attorney's Office, not Cline Williams. Furthermore, even assuming that Jones Bank is Financial Institution 3 referenced in Count III of the Superseding Indictment, Jones Bank is not a victim in this case. The Government has identified three victims in the indictments: Victim 1, Victim 2, and Victim 4. *See* Filing 1; Filing 98. The Government has also identified three financial institutions, but those financial institutions are "third parties" that the Government alleges the defendant "used to further the scheme to defraud the ultimate victims," not victims themselves. *United States v. Hansmeier*, 988 F.3d 428, 437 (8th Cir. 2021) ("[I]t is not the case that the victims targeted must be the direct recipients of the materially deceptive statement or concealment. . . . Rather, we have held that the misrepresentations may be made to third parties, where the third parties are used to further the scheme to defraud the ultimate victims." (internal citations omitted)).

The defendant does cite other nonbinding cases in support of his conflict-of-interest claim, and unlike *Prevezon Holdings* these cases do address the possibility of a conflict of interest from a Sixth Amendment perspective. *See* Filing 113 at 10. However, these cases do not help the defendant because the courts in all of the cases considered whether the defendant's criminal defense counsel had a conflict of interest that violated the defendant's Sixth Amendment rights based on the criminal defense counsel's prior representation of a trial witness or codefendant. *See Jones v. Polk*, 401 F.3d 257, 266–68 (4th Cir. 2005) (rejecting the defendant's post-conviction claim that his "trial counsel . . . operated under an unconstitutional conflict of interest by representing a prosecution witness . . . in an unrelated matter while he represented [the defendant]" but noting that "there is no question that this concurrent representation was exceedingly ill-advised"); *Church v. Sullivan*, 942 F.2d 1501, 1509–13 (10th Cir. 1991) (remanding the defendant's post-conviction conflict of interest claim for the district court to determine whether the defendant was adversely affected by his trial counsel's prior representation of a state witness during an unrelated state criminal case); *United States v. Coscia*, 4 F.4th 454, 475–79 (7th Cir. 2021) (acknowledging that the defendant's trial attorney's prior involvement "in providing legal and lobbying services" to ICE—a government witness in the defendant's criminal case—did constitute a conflict of interest but finding that the conflict did not adversely affect the defendant's trial attorney's performance).

As the Court has already explained, the defendant has not alleged that any of his criminal defense attorneys—Creager, Monzon, or Rater—have any conflicts of interest that threaten his Sixth Amendment right to effective assistance of counsel. Thus, the defendant runs into the same issue as before: "the application of the Sixth Amendment right to effective assistance of counsel" in response to Cline Williams's prior representation of the defendant and BV Builders in civil matters and its current representation of Jones Bank in civil matters "entails the pounding of a square peg into a

round hole." *Poe*, 428 F.3d at 1122. The defendant's allegations regarding Cline Williams's representations do not support a finding that the defendant's Sixth Amendment right to effective assistance of counsel has been violated.

      b.  The Filter Review

The Court now considers the defendant's allegations regarding the filter review process and addresses whether those allegations support a finding that the defendant's Sixth Amendment right to effective assistance of counsel has been violated. Unlike the defendant's allegations regarding Cline Williams's representation of Jones Bank, the defendant's filter review allegations can only be assessed under one Sixth Amendment theory: whether the defendant has "establish[ed] a Sixth Amendment claim based on violation of the attorney-client privilege." *Tyerman*, 701 F.3d at 559. The Court set forth the standards for this type of Sixth Amendment claim in detail in Section II.B.1.a.i. above, but in short, "[t]o establish this violation, 'a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, or created a substantial threat of prejudice.'" *Hari*, 67 F.4th at 912 (quoting *Singer*, 785 F.2d at 234). The defendant's filter review allegations fail to get past the first prong.

The defendant identifies three issues with the filter review process that he believes resulted in the Government having "improper access to [his] attorney-client records" in violation of his Sixth Amendment right to effective assistance of counsel. Filing 113 at 2, 3. Those alleged issues are: (1) individuals at Government agencies, including the Federal Deposit Insurance Corporation (FDIC) and the Federal Housing Finance Agency (FHFA), received copies of the defendant's "records" "[p]rior to the filter review being set up"; (2) an agent from the FHFA Office of Inspector General, "a member of the prosecution team, had a copy of [the defendant's] records on the computer during"

an August 2024 proffer meeting and "was able to immediately locate and reference an email from [those] unfiltered records"; and (3) there was a "year-long delay" in the Government "conducting the filter review," as a Federal Bureau of Investigation (FBI) agent made the initial request for a filter review of the seized devices on March 5, 2024, and the "proposed filtered documents were not turned over" to Monzon for review until May 2, 2025. Filing 113 at 2, 4, 6. The defendant supports these allegations with multiple exhibits. The defendant's Exhibit 101 appears to be a "Technical Report" from the FBI dated April 25, 2025. Filing 112-2. Exhibit 102 is an affidavit of the defendant dated November 3, 2025. Filing 112-3. And Exhibit 103 is a screenshot of text messages between the defendant and Monzon from June 12 and June 17 of an unknown year. Filing 112-3.

In response, the Government claims that the "documents referred to by the Defendant in the proffer, which have been provided to the Defendant, were obtained from Jones Bank, not from the Defendant's device extractions." Filing 132 at 1. The Government further alleges that it "never accessed the device extractions until after the filter process was completed, and then only accessed the filtered production." Filing 132 at 1.

The filter review process has already been extensively litigated in this case. It was the subject of at least three separate status conferences in June of 2025. Monzon, then-counsel for the defendant, raised concerns with the process to Judge Carson and Judge Carson addressed those concerns by fashioning a solution that accommodated the defendant's request to retrieve all nine of the seized devices and perform his own review of them. *See* Filing 73; Filing 78. The parties did not object to Judge Carson's solution and there were apparently no problems or concerns with its implementation. Thus, to the extent Motion 2 seeks to relitigate issues that the Court has already decided, it is denied.

To the extent Motion 2 raises new issues with the filter review in the Sixth Amendment context, that motion is also denied. The defendant does not specifically state which attorney-client

relationship he believes the Government intruded upon through the filter review process—his attorney-client relationship with Cline Williams or his attorney-client relationships with any or all of his criminal defense attorneys. *See generally* Filing 112; Filing 113. Based on the defendant's allegation that "the filter team lost control of their ability to safeguard the privileged attorney-client documents of Bryce Nolde and BV Builders," the Court presumes that the defendant is concerned with his attorney-client relationship with Cline Williams. Filing 112 at 3. Above, the Court addressed the defendant's attorney-client relationship with Cline Williams in the Sixth Amendment context in relation to the documents produced in response to a subpoena and found that no Sixth Amendment right to counsel had not attached where the documents were produced prior to defendant's indictment. *See Gouveia*, 467 U.S. at 187 ("[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him."). Now, the Court considers the defendant's attorney-client relationship with Cline Williams in the Sixth Amendment context in relation to any privileged communications that may have been on the nine devices seized from the defendant and subjected to the filter review. The Court concludes that the defendant's filter review allegations do not establish that the Government intruded into his attorney-client relationship with Cline Williams in violation of the Sixth Amendment because the defendant has not "prove[n] an act of 'deliberate intrusion'" on the Government's part. *Hari*, 67 F.4th at 912 (quoting *Tyerman*, 701 F.3d at 559). Rather, the filter review process itself and the parties' many discussions of that process with Judge Carson demonstrate that the Government took deliberate steps to *avoid* intruding on the attorney-client relationship. During the June 17, 2025, status conference, Lynch explained that after the defendant's nine devices were seized, Lynch asked Creager for the names of any attorneys whose potentially privileged communications could appear on the devices. As Packard described during

the June 26, 2025, status conference, he was then tapped to lead a filter review team to process those devices and filter out any potentially privileged communications, and he did so without any input from Lynch and the prosecution team. Packard even noted that during the filter review process, the filter team noticed the name of a law firm that did not appear on Creager's initial list and added that firm to the list of search terms in order to filter out communications from that firm.

The defendant argues that his Exhibit 101, at Filing 112-2, proves that "the filter team made copies of [his] documents prior to a filter review and gave them to the FDIC." Filing 113 at 3. He bases this claim on the following sentence in the report: "Working copy of non-mobile extractions was copied to provided hard drive and sent to FDIC for analysis." Filing 112-2 at 2; *see also* Filing 112 at 2 ("The report does not state when the working copy was provided to the FDIC, but we know from the report that it was done prior to the report date of April 25, 2025."). The defendant appears to ignore the very next sentence in the report: "It was later requested that a working copy of mobile items not be created for FDIC analysis." Filing 112-2 at 2. Based on this sentence and the Government's credible representation that it "never accessed the device extractions until after the filter process was completed,"[10] the Court doubts that unfiltered copies of the defendant's documents were shared at any point. Filing 132 at 1. And even if a working copy was provided to the FDIC, the defendant himself acknowledges that it is unclear from the report when that would have occurred. Filing 112 at 2. As the defendant points out, assuming a working copy was given to

---

[10] The defendant also claims that "[a]t an August 2024 proffer meeting, FHFA-OIG Agent Nickell was able to immediately locate and reference an email from Nolde's unfiltered records, demonstrating actual use of unfiltered materials prior to any filter review." Filing 113 at 4. The Government's response, which the Court finds credible, is that "[t]he documents referred to by the Defendant in the proffer, which have been provided to the Defendant, were obtained from Jones Bank, not from the Defendant's device extractions." Filing 132 at 1. Importantly, the defendant has not alleged that the email apparently referenced at the August 2024 proffer was an attorney-client privileged communication. The Court therefore does not further address whether that email could support a Sixth Amendment claim based on the violation of attorney-client privilege.

the FDIC, presumably "it was done prior to the report date of April 25, 2025." Filing 112 at 2. The defendant states that the filter team notified Monzon of its completion of the filter review on March 5, 2025—more than a month before the April 25 report—so even if a working copy of documents was provided to the FDIC, the defendant's own timeline leaves room for that copy to have been delivered after the filter review was completed. Filing 112 at 2. In light of all this and having reviewed the parties' extensive arguments related to the filter review process during the June 2025 status conferences, the Court concludes that there has been "no showing that the government knowingly intruded on the attorney-client relationship" and finds therefore that no part of the filter review violated the defendant's Sixth Amendment rights. *Hari*, 67 F.4th at 912.

To the extent the defendant bases his Sixth Amendment claim on the "delay of over one year in completing the filter review," the Court has already addressed the time elapsed since the beginning of this case in great length in Section II.A.2. above. For all these reasons, the Court denies the Sixth Amendment claim asserted in Motion 2.

### 2. *The Fifth Amendment Claim*

The Court turns to the defendant's Fifth Amendment claim in Motion 2. The defendant alleges generally that the indictments should be dismissed for "violations of [his] rights under the 5th . . . Amendment[ ]." Filing 112 at 10. The Fifth Amendment to the United States Constitution guarantees defendants that their "life, liberty, or property" will not be deprived "without due process of law." U.S. Const. amend. V. The Fifth Amendment Due Process Clause protects defendants from "outrageous government conduct," and defendants can seek to dismiss an indictment due to such conduct. *See United States v. Searcy*, 233 F.3d 1096, 1101 n.3 (8th Cir. 2000) ("The claim of outrageous government conduct rests on the Due Process Clause of the Fifth Amendment." (citing *United States v. Russell*, 411 U.S. 423, 431–32 (1973))); *United States v. Williams*, 720 F.3d 674,

687 (8th Cir. 2013) ("On a motion to dismiss an indictment for outrageous government conduct, [the Eighth Circuit] reviews the district court's legal determinations *de novo* and reviews factual findings for clear error."). "[T]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *Williams*, 720 F.3d at 686 (alteration in the original) (quoting *United States v. King*, 351 F.3d 859, 867 (8th Cir. 2003)). "This defense is reserved for conduct that falls within the narrow band of the most intolerable government conduct." *King*, 351 F.3d at 867 (internal quotation marks and citations omitted). Importantly, "the defense of outrageous government conduct focuses on the government's actions." *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (internal quotation marks omitted) (quoting *United States v. Hunt*, 171 F.3d 1192, 1195 (8th Cir. 1995)).

Having reviewed Motion 2 and the defendant's brief supporting it, the Court concludes that the defendant's Fifth Amendment claim relies on the same two sets of allegations as his Sixth Amendment claim: the allegations regarding Cline Williams's representation of Jones Bank and the allegations regarding the filter review process. The defendant has not shown the high level of outrageousness required to prove a constitutional violation based on either set of allegations. The Court begins with the Cline Williams allegations. Considering those allegations from a Fifth Amendment standpoint, the defendant has not shown that the Government did anything besides receive records produced by Cline Williams on behalf of Financial Institution 3 in response to a subpoena. This is not conduct "fall[ing] within the narrow band of the most intolerable government conduct." *King*, 351 F.3d at 867 (internal quotation marks and citation omitted). The defendant's claims about Cline Williams instead focus on the actions of Cline Williams—"Cline Williams's continued representation of Jones Bank, its production of adverse records, and its coordination with investigators." Filing 113 at 10. Absent any outrageous government conduct, the actions of Cline

50

Williams are not appropriate grounds for a motion to dismiss under the Fifth Amendment Due Process Clause. *See Combs*, 827 F.3d at 794 ("[T]he defense of outrageous government conduct focuses on the government's actions." (internal quotation marks and citation omitted)).

The defendant's filter review allegations fare no better in the Fifth Amendment context. Unlike the defendant's Cline Williams allegations, his filter review allegations do assert government conduct—namely, that "the filter review team made copies of Bryce Nolde's documents prior to a filter review and gave them to the FDIC," "the FHFA had copies of the document prior to the filter review," and "the FHFA had the documents on their computer at the proffer meeting." Filing 113 at 3. The Court has already addressed this alleged conduct in Section II.B.1.b. above, where it found that the conduct did not constitute a deliberate intrusion into the defendant's attorney-client relationship with Cline Williams. *See Williams*, 720 F.3d at 686 (considering in part whether the government deliberately intruded into "an ongoing, personal attorney-client relationship between its informant and the defendant"). As the Court mentioned in its Sixth Amendment analysis of this alleged conduct, the Court doubts that the filter team made copies of the defendant's unfiltered documents, and it credits the Government's statement that the prosecution team did not receive any documents until the filter review was completed. Regardless, the alleged government conduct is not "so outrageous as to violate due process," *Combs*, 827 F.3d at 795, and it does not "shock the conscience of the court," *King*, 351 F.3d at 867 (internal quotation marks and citation omitted). The Court therefore denies the Fifth Amendment claim asserted in Motion 2.

3.  *The Brady Claim*

a.  The Parties' Arguments

Motion 2 also alleges "violations of the Brady rule" based on the defendant's belief that "no interviews were done of Jones Bank employees." Filing 112 at 6, 10. This argument turns on the

51

defendant's claim that Financial Institution 3 in Count III of the Superseding Indictment is Jones Bank. Filing 112 at 6. According to the defendant, "[d]espite Jones Bank being a central figure in the alleged wire fraud, and despite FDIC and FHFA's regulatory authority, there is no evidence that the government conducted formal interviews with Jones Bank employees." Filing 113 at 6. The defendant claims that the Government denies interviewing any Jones Bank employees "despite the fact that [the defendant's] former counsel, Carlos Monzon, and his assistant, Jacqueline Dalgado, both informed Nolde that a video existed of the FDIC's interview of Jones Bank employees conducted with Cline Williams present, and that they had viewed the recording." Filing 112 at 6. In taking issue with the lack of interviews, the defendant cites *Brady v. Maryland*, 373 U.S. 83 (1963), and contends that "[w]here no interviews have been conducted with any employees of a victim, the Brady obligation still applies to any evidence in the possession of the government or its agents that is favorable to the defense." Filing 113 at 7–8. Pointing to out-of-circuit case law, the defendant argues that "[t]he prosecution cannot evade its duty by remaining ignorant of evidence held by investigating agencies or other government actors." Filing 113 at 8. The defendant explains that the "omission" of Jones Bank interviews "is particularly prejudicial" because his "defense is based in part on the assertion that Jones Bank's own failures to follow FDIC guidelines regarding construction loans contributed to the alleged losses" to BV Builders' customers. Filing 113 at 6.

> In response, the Government states:

> Some of Defendant's customers secured construction financing through Financial Institution 3. The Defendant has been provided copies of the interviews of the victim customers. There were no interviews of employees of Financial Institution 3 by the investigators in this matter. Defendant remains free to investigate or pursue his claimed defense involving Financial Institution 3.

Filing 132 at 4. The Government reiterates that Financial Institution 3 is "not a named victim in the Superseding Indictment." Filing 132 at 4.

### b. Applicable Standards

Under *Brady*, "the government has an affirmative duty to disclose evidence that is favorable to the accused and material to either guilt or punishment; this rule extends to impeachment evidence." *United States v. Heppner*, 519 F.3d 744, 750 (8th Cir. 2008). "Evidence is material 'when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *United States v. Williams*, 951 F.3d 892, 897 (8th Cir. 2020) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)). "The government need not disclose evidence that is, *inter alia*, available through other sources or not in the possession of the prosecutor." *United States v. Whitehead*, 176 F.3d 1030, 1036 (8th Cir. 1999). Put differently, "*Brady* does not require the government to discover information not in its possession or of which it was not aware." *Heppner*, 519 F.3d at 750; *see also United States v. Turner*, 104 F.3d 217, 220 (8th Cir. 1997) ("Under the first prong of the *Brady* analysis, 'the government has no affirmative obligation to discover potentially exculpatory information which it neither possessed nor was aware of.'" (quoting *United States v. Hawkins*, 78 F.3d 348, 351 (8th Cir. 1996))). "As a result, there is no *Brady* violation if the government does not 'possess' the material at issue." *Turner*, 104 F.3d at 220 (quoting *United States v. Jones*, 34 F.3d 596, 599 (8th Cir. 1994)).

### c. There Has Been No *Brady* Violation

The defendant asserts that he believes "investigators from the FDIC and FHFA, in accordance with their respective agencies' purposes, likely spoke with employees or representatives of Jones Bank, and that such information would have included exculpatory evidence on behalf of Bryce Nolde and BV Builders." Filing 112 at 9. He apparently bases this belief on "multiple" statements from Monzon—the defendant's former defense counsel—and Monzon's assistant indicating that "they had viewed a video containing an interview of Jones Bank being interviewed

by the FDIC with Cline Williams present." Filing 112-3 at 3. The defendant explains that he "requested access to this video multiple times prior to firing Monzon Law without being given access to full discovery." Filing 112-3 at 3. However, the Government counters that "[t]here were no interviews of employees of Financial Institution 3 by the investigators in this matter," Filing 132 at 4, and the defendant appears to concede this because he states multiple times that his concern is with the Government's "decision to *not* interview members of Jones Bank." Filing 112 at 9 (emphasis added); *see also* Filing 113 at 6 (arguing that "the fact that the Government did not interview a named victim in the indictment namely Jones Bank is a grounds for dismissal" (reduced from capitals) and noting that "there is no evidence that the government conducted formal interviews with Jones Bank employees"), 8 (addressing "the failure of the investigative team to conduct interviews of employees of Jones Bank"); 12 (explaining that "the failure to interview employees from Jones Bank which would have likely provided Brady material violated Defendant's rights").

While *Brady* imposes upon the Government "an affirmative duty to disclose evidence that is favorable to the accused and material to either guilt or punishment," *Heppner*, 519 F.3d at 750, it is "well settled" law in this circuit that "there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" *United States v. Tierney*, 947 F.2d 854, 864 (8th Cir. 1991) (quoting *United States v. Beaver*, 524 F.2d 963, 966 (5th Cir. 1975), *cert. denied*, 425 U.S. 905 (1976)). Here, apart from a single halfhearted claim that investigators from the FDIC and FHFA interviewed Jones Bank employees, the defendant does not argue that the Government possesses and is withholding from the defendant information from any such interview. Because the defendant does not meaningfully argue that the Government is suppressing Jones Bank interview evidence that is in the Government's possession and because the Court credits the Government's assertion that no Jones Bank interview evidence ever existed, the Court concludes that defendant's

issues with the lack of any Jones Bank interviews are not grounds for a *Brady* claim. *See Jones*, 34 F.3d at 599 ("There is, therefore, no *Brady* violation if the government does not possess the material at issue."); *Heppner*, 519 F.3d at 750 (rejecting the appellants' argument that "the government breached its *Brady* obligations by ignoring and failing to collect information about the religious beliefs of investors" because "*Brady* does not require the government to discover information not in is possession or of which it was not aware").

Even the defendant's passing allegation that investigators from the FDIC and FHFA interviewed Jones Bank employees, when taken as true, does not support a *Brady* claim in this case. The defendant points to a Supreme Court case, *Kyles v. Whitley*, 514 U.S. 419 (1995), and case law from other circuits to argue that "the Brady obligation still applies to any evidence in the possession of the government or its agents that is favorable to the defense." Filing 113 at 7–8. The defendant's argument appears to be that if any Government entity has favorable evidence in its possession, the prosecution must disclose that evidence to the defendant under its *Brady* obligations. This is an inaccurate assessment of the law. *Kyles*—which the defendant's out-of-circuit cases rely on— concludes that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf *in the case*, including the police." *Kyles*, 514 U.S. at 437 (emphasis added); *see also United States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009) (explaining that, "[a]s the prevailing Supreme Court precedents make clear, the district court should have considered whether the government failed to disclose the relevant information in the possession of *any* of its agents involved in Price's prosecution, not just what the prosecutor himself personally knew" (emphasis in the original)); *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021) (noting that the *Brady* obligation "applies to evidence known only to police investigators and not to the prosecutor" (internal quotation marks and citation omitted)). *Kyles* does not require an individual

55

prosecutor to learn of any favorable evidence known to other government entities acting in other cases. The defendant believes that there was "an apparent investigation into Jones Bank" and "that investigators from the FDIC and FHFA, in accordance with their respective agencies' purposes, likely spoke with employees or representatives of Jones Bank." Filing 112 at 9. Regardless of whether government entities investigated Jones Bank, evidence from that investigation would not fall under *Brady*'s ambit in this case because the prosecutor's "duty to learn of favorable evidence" extends only to evidence "known to the others acting on the government's behalf *in the case*." *Kyles*, 514 U.S. at 437 (emphasis added). And as the Government has stated and the defendant has not contested, "[t]here were no interviews of employees of Financial Institution 3 by the investigators *in this matter*." Filing 132 at 4 (emphasis added); Filing 113 at 6 ("Despite Jones Bank being a central figure in the alleged wire fraud, and despite the FDIC and FHFA's regulatory authority, there is no evidence that the government conducted formal interviews with Jones Bank employees.").

Accordingly, the Court denies the defendant's motion to dismiss based on *Brady* violations.

### 4. The Defendant's Passing Reference to Suppression of Evidence

The Court must address one final issue before leaving Motion 2. In the defendant's prayer for relief, he makes a passing reference to the suppression of evidence, asking "alternatively, that the Court suppress any evidence illegally obtained." Filing 112 at 10. The defendant does not identify what evidence he would like the Court to suppress, and his brief supporting Motion 2 does provide any clarity. In fact, the defendant's brief altogether fails to address the suppression of any evidence. *See generally* Filing 113. If the defendant intended for Motion 2 to also be a motion to suppress, he has run afoul of the Court's local rules and waived the issue of suppression. *See* NECrimR 12.3(b)(1) ("The brief must (A) concisely state the basis for the motion, (B) cite relevant legal authority, and (C) cite to the pertinent pages of the record, affidavit, discovery material, or

other evidence on which the moving party relies. A party's failure to brief an issue raised in a motion may be considered a waiver of that issue."). The defendant's barebones request for the "suppress[ion] of any evidence illegally obtained" does not warrant the Court's consideration where it is not "definite, specific, and detailed to establish a contested issue of fact." *United States v. Foster*, 15 F.4th 874, 876 (8th Cir. 2021) ("A district court is required to hold an evidentiary hearing on a motion to suppress whenever the moving papers are sufficiently definite, specific, and detailed to establish a contested issue of fact." (internal quotation marks and citation omitted)).

For all of the reasons laid out in the sections above, Motion 2 is denied.

### C. Motions 3, 4, and 5

The Court now considers Motions 3, 4, and 5 together, as all three motions ask the Court to dismiss the charges in the indictments for failure to state a claim. Motion 3 addresses Count I of the Indictment and Superseding Indictment and includes seven attached exhibits. Filing 120 at 1; Filing 120-1; Filing 120-2; Filing 120-3; Filing 120-4; Filing 120-5; Filing 120-6; and Filing 120-7. Motion 4 addresses Count III of the Superseding Indictment and is supported by three exhibits. Filing 122 at 1; Filing 122-2; Filing 122-3; and Filing 122-4. Motion 5 addresses Count II of the Superseding Indictment and includes six exhibits. Filing 124 at 1; Filing 124-1; Filing 124-2; Filing 124-3; Filing 124-4; Filing 124-5; and Filing 124-6.

The defendant's specific arguments vary depending on the motion. For example, in Motion 3, the defendant argues against Count I of the indictments on the ground that he only signed for and approved one draw from Victim 1's and Victim 2's construction loan at Financial Institution 1 and that Financial Institution 1 then "made copies" of the defendant's signature for future draws. Filing 120 at 2. The defendant's primary argument against Count III of the Superseding Indictment is that "no fraudulent statements were made in his draw requests to Jones Bank." Filing 123 at 1. And the

57

defendant challenges Count II of the Superseding Indictment on the basis that "[t]he facts surrounding the alleged Count II display continued civil contract disputes, not a fraudulent scheme." Filing 124 at 2.

Despite the varied arguments across Motions 3, 4, and 5, all three motions are governed by the same standards.[11] In considering a "motion to dismiss an indictment for failure to state an offense," courts "accept the allegations stated in the indictment as true" and "ask whether they can form the basis of the charged offense." *Hansmeier*, 988 F.3d at 436. At this stage of the proceedings, courts do not consider "allegations outside the indicting document." *United States v. Welker*, 75 F.4th 820, 821 (8th Cir. 2023) (internal quotation marks omitted) (quoting *United States v. Steffen*, 687 F.3d 1104, 1107 n.2 (8th Cir. 2012)). "An indictment is normally sufficient if its language tracks the statutory language," *Steffen*, 687 F.3d at 1113 (quoting *United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008)), but "[a]n indictment need not use the specific words of the statute, so long as by fair implication it alleges an offense recognized by law," *United States v. Villareal*, 707 F.3d 942, 957 (8th Cir. 2013) (internal quotation marks and citations omitted). Put differently, "[w]hether an indictment sufficiently states an offense . . . depends on the elements of the charged offense." *Welker*, 75 F.4th at 822.

The charged offense in this case is wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343. The sole count in the Indictment and all three counts in the Superseding Indictment charge the defendant with violating the federal wire fraud statute. *See* Filing 1; Filing

---

[11] Based on the defendant's arguments and evidence supporting each motion, it appears that the defendant seeks summary judgment on the three counts against him. "There is no procedure in federal criminal cases equivalent to the motion for summary judgment in civil cases, and the government has no duty to reveal all of its proof before trial." *United States v. Grubb*, 135 F.4th 604, 607 (8th Cir. 2025). "[S]o long as the indictment contains a facially sufficient allegation of materiality, federal criminal procedure does not 'provide for a pre-trial determination of sufficiency of the evidence.'" *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001) (quoting *United States v. Critzer*, 951 F.2d 306, 307–08 (11th Cir. 1992)).

98. In reviewing Motions 3, 4, and 5, "[t]he question of whether the facts alleged in the indictment adequately state an offense therefore turns on the elements of" the wire fraud offense. *Hansmeier*, 988 F.3d at 436. The Eighth Circuit has held that "[a] slightly greater level of detail is required for the bank, mail, or wire fraud statutes, for which an indictment must 'specify facts . . . with such reasonable particularity as will apprise the defendant, with reasonable certainty, of the nature of the accusation and as will enable the court to say that the facts stated are sufficient in law to support a conviction.'" *Hansmeier*, 988 F.3d at 436 (quoting *Steffen*, 687 F.3d at 113). The elements of wire fraud are "(1) a scheme to defraud by means of material false representations or promises; (2) intent to defraud, (3) reasonable foreseeability that the [wire] would be used, and (4) that the [wire] was used in furtherance of some essential step in the scheme." *Welker*, 75 F.4th at 822–23 (quoting *United States v. Louper-Morris*, 672 F.3d 539, 555 (8th Cir. 2012)); *see also Eighth Circuit Manual of Model Jury Instructions (Criminal)* 6.18.1343 (2025). Because the defendant has been charged with wire fraud affecting a financial institution, the final element is the "affecting a financial institution" element. *See United States v. DeRosier*, 501 F.3d 888, 898 (8th Cir. 2007). In light of all this, the Court considers whether the charging documents in this case have "alleged specific facts to support each element of the . . . wire fraud offenses for which [the defendant] was charged." *Id.* at 823. The Court finds that they have.

Taking the allegations in the Indictment as true, the Indictment has sufficiently alleged that the defendant engaged in a "deceptive scheme[ ] to deprive the victim[s]" identified in the charging document "of money or property." *Welker*, 75 F.4th at 822 (internal quotation marks omitted) (quoting *Kelly v. United States*, 590 U.S. 391, 398 (2020)). The Indictment alleges that the defendant through BV Builders engaged in a scheme to defraud BV Builders' customers by accepting payments from the customers and drawing funds from the customers' construction loans while

fraudulently representing that the funds were being used to pay subcontractors and suppliers working on the customers' construction projects, even though the defendant through BV Builders did not pay the subcontractors and suppliers and instead used all or part of the funds for other, unrelated purposes. The Indictment contains specific facts showing how this scheme to defraud allegedly deprived Victims 1 and 2 of money or property, asserting that Victims 1 and 2 hired BV Builders to construct a barndominium and financed the project with a construction loan through Financial Institution 1, which the defendant received draws from based on fraudulent representations that the funds were needed to pay four subcontractors for their work on the barndominium. The Indictment alleges that in order to obtain the funds from the victims' construction loan, the defendant signed a document with Financial Institution 1 acknowledging that all costs on prior draws had been paid (including payment of subcontractors and suppliers) and he or other BV Builders employees signed checks that included a certification that all bills related to labor and/or materials had been paid in full, even though BV Builders had not paid the four subcontractors in full. Furthermore, the Indictment alleges that the defendant sent or caused to be sent an email to Victim 1 and two employees of Financial Institution 1 requesting approval for the final draw on the victim's construction loan. These alleged actions of the defendant and others connected to BV Builders support that the defendant had the intent to defraud the victims, that it was reasonably foreseeable that his email seeking approval on the final draw would be used and was used in furtherance of an essential step in the scheme to defraud, and that the scheme to defraud affected a financial institution. Thus, "the conduct recounted in the indictment constitutes a 'scheme . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Hansmeier*, 988 *F.3d at 438* (quoting 18 U.S.C. § 1343).

Similarly, the Superseding Indictment also "lays out a sufficient basis for" the three counts of wire fraud affecting a financial institution stated therein. *Hansmeier*, 988 F.3d at 438. Regarding the "deceptive scheme," the Superseding Indictment contains many of the same allegations first asserted in the Indictment and adds specific allegations relating to the additional wire fraud counts. For instance, the Superseding Indictment alleges that the defendant submitted or caused to be submitted in interstate commerce a sworn statement to Financial Institution 2 representing that all subcontractors had been paid for products and services rendered to date (Count II) and that he sent or caused to be sent an email to Victim 4 and one employee of Financial Institution 3 requesting approval for the final draw on the victim's construction loan (Count III). Taking these allegations and the allegations regarding Count I as true and considering the allegations in the context of the scheme to defraud outlined in the Superseding Indictment, the Court finds that they support that the defendant had the intent to defraud the victims, that it was reasonably foreseeable that his email and sworn statement would be used and were used in furtherance of essential steps in the scheme to defraud, and that the scheme to defraud affected financial institutions.

In sum, both the Indictment and Superseding Indictment "lay[ ] out a sufficient basis for the government's charge[s]" and "inform[ ] the court and the parties involved of the facts underlying th[ose] charges[s]." *Hansmeier*, 988 F.3d at 438. "This is what is legally required of an indictment." *Id.* The defendant's motions to dismiss the charging documents for failure to state a claim are therefore denied.[12] At trial, the defendant is "free to dispute the facts, offer alternative explanations

---

[12] The Government construes Motions 3, 4, and 5 as "Motions to Dismiss on the premise that the Counts of Superseding Indictment lack probable cause." Filing 132 at 5. The Court believes those motions are more appropriately construed as motions to dismiss for failure to state an offense and has analyzed those motions accordingly. However, to the extent Motions 3, 4, and 5 do seek to dismiss the charges in the Superseding Indictment for lack of probable cause, those motions are denied. The Government is correct that "an indictment fair upon its face and returned by a properly constituted grand jury . . . conclusively determines the existence of probable cause to believe the defendant perpetrated

for his conduct, or provide context to any of the actions alleged" but at this stage of the proceedings, the defendant's "possible defenses are not relevant to [the Court's] consideration of whether the indictment[s] [themselves] properly state[ ] the basis for the charged offenses." *Hansmeier*, 988 F.3d at 438. In short, the Court "simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be." *Ferro*, 252 F.3d at 968 (quoting *United States v. DeLaurentis*, 230 F.3d 659, 661 (3d. Cir. 2000)). Accordingly, the Court denies Motions 3, 4, and 5.

### D.  Motion 6

Finally, the Court turns to Motion 6. Filing 126. In this motion, the defendant seeks dismissal of the Superseding Indictment "for being so overbroad and vague so that [the defendant] is not properly able to make his defense." Filing 126 at 2. The defendant argues that apart from "three separate wire transactions" that are listed "with specificity," "[n]othing else in the [Superseding] indictment is specific." Filing 126 at 2. Thus, the defendant contends, the Superseding Indictment "lack[s] the necessary specificity."[13] Filing 127 at 1. The Government responds that the Superseding Indictment "is properly alleged and is adequately stated" and points out that "[d]espite attempting to argue on the merits of his case in [Motions 3, 4, and 5], Defendant claims here that the charging document is so vague he cannot defend himself." Filing 132 at 6.

An indictment is sufficient if "it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient

---

the offense alleged." *Kaley v. United States*, 571 U.S. 320, 328 (2014) (cleaned up). The defendant has not challenged the facial fairness of the charging documents in this case or that they were returned by a properly constituted grand jury.

[13] In support of this argument, the defendant points the Court to Rule 9(b) of the Federal Rules of Civil Procedure. Filing 127 at 3. Because this is a criminal case, the Federal Rules of Civil Procedure do not apply. The case that the defendant cites alongside Rule 9(b), *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818 (8th Cir. 2009), is a civil case that is likewise inapplicable to this criminal matter.

information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." *Sewell*, 513 F.3d at 821 (quoting *United States v. Hernandez*, 299 F.3d 984, 992 (8th Cir. 2002)). "An indictment will ordinarily be held sufficient unless it is so defective that it cannot be said, by any reasonable construction, to charge the offense for which the defendant was convicted." *Id.* (quoting same).

The Court has already spent a considerable amount of time evaluating the Superseding Indictment in its analysis of the defendant's Motions 3, 4, and 5. As the Court explained in Section II.C. above, the Superseding Indictment contains specific facts supporting each element of the charged offenses. The Court reached this conclusion even after considering the "slightly greater level of detail" required for the wire fraud statute. *Hansmeier*, 988 F.3d at 436. The Court now finds that the Superseding Indictment also "fairly informs the defendant of the charges against which he must defend" and "alleges sufficient information to allow [him] to plead a conviction or acquittal as a bar to subsequent prosecution." *Sewell*, 513 F.3d at 821. Indeed, as the Government noted in its response, the defendant has previewed his defenses to each count of the Superseding Indictment in his arguments supporting Motions 3, 4, and 5, suggesting that he has been fairly and sufficiently informed of the charges against him. Also, to the extent the defendant argues that the Superseding Indictment is defective because it does not identify the victims or financial institutions named within it, he does not cite any authority supporting that claim. To the contrary, courts have frequently held that the failure to identify a victim by name in an indictment is not fatal. *See, e.g.*, *United States v. Vogelpohl*, No. 18-CR-3035-CJW-MAR, 2019 WL 2236263, at *3 (N.D. Iowa May 23, 2019) (concluding that "[t]he identity of the victim is not an essential element of the offense in this case" and the government's failure to reference the victim by initials does not constitute "a fatal flaw"); *United States v. Evans*, 272 F.3d 1069, 1084 (8th Cir. 2001) ("This Court has upheld indictments,

like the ones at issue here, that failed to identify victims by name."). Because the Court concludes the Superseding Indictment is sufficient, Motion 6 is denied.

## III. CONCLUSION

For the foregoing reasons, all six of the defendant's motions to dismiss are denied. Accordingly,

IT IS ORDERED:

1. The defendant's Motion to Dismiss Count(s), Motion to Dismiss Criminal Case, Filing 104, is denied;

2. The defendant's Motion to Dismiss Criminal Case, Filing 112, is denied;

3. The defendant's Motion to Dismiss Criminal Case Count I, Filing 120, is denied;

4. The defendant's Motion to Dismiss Criminal Case Count III, Filing 122, is denied;

5. The defendant's Motion to Dismiss Criminal Case Count II, Filing 124, is denied; and

6. The defendant's Motion to Dismiss Criminal Case, Filing 126, is denied.

Dated this 13th day of January, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge