IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BRYCE A. NOLDE,<br><br>Defendant. | **8:24-CR-23**<br><br>**MEMORANDUM AND ORDER ON THE DEFENDANT'S ORAL MOTION FOR JUDGMENT OF ACQUITTAL ON COUNT I AND COUNT III OF THE SUPERSEDING INDICTMENT** |

This matter is before the Court on defendant Bryce A. Nolde's oral Motion for Judgment of Acquittal. The defendant was charged with three counts of wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343. Filing 98. Trial in this matter began on January 26, 2026. The jury received the case eight days later on February 4, 2026, at approximately 12:10 p.m. After taking an hour or so for lunch, the jury began deliberations and notified the Court that they were prepared to return a verdict at approximately 2:15 p.m. on the same day. Their verdict was guilty on all three counts of the Superseding Indictment.

Earlier in the trial, on February 2, after the Government rested its case in chief, defense counsel orally moved for a judgment of acquittal on all three counts. Pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, the Court reserved its decision on the defendant's motion and permitted the defendant to present his defense, which he did. The Government presented rebuttal evidence. After the Government rested its rebuttal case on February 4, defense counsel renewed the oral Motion for Judgment of Acquittal. At that time, the Court denied the motion as to Count II,

1

concluding that a reasonable jury could find on the record presented that the Government had proven beyond a reasonable doubt the four elements of wire fraud affecting a financial institution on that charge. However, the Court stated its intention to enter a written order regarding the defendant's motion as it applied to Count I and Count III.

The Court is issuing this written order because the Government did a less than stellar job of proving two elements of Counts I and III: the third element, which requires proof that the defendant used or caused to be used an interstate wire communication in furtherance of or in an attempt to carry out some essential step in the scheme, and the fourth element, which requires proof that the scheme affected a financial institution. The Court acknowledges at the outset of this order that there is no reasonable argument that the emails at issue in Counts I and III were not interstate wire communications or that the banks identified in Counts I and III were not financial institutions affected by a scheme to defraud under applicable law. Despite this obvious reality, the law requires the Government to put on evidence as to those two elements that is sufficient for the jury to reach these straightforward conclusions beyond a reasonable doubt. The Government easily could have provided such evidence in an unassailable manner through less than ten minutes of testimony during this eight-day trial. That is not what happened.

Nevertheless, the Court concludes that the Government did just enough for a reasonable jury to find that these elements were proven beyond a reasonable doubt. The Court therefore denies the defendant's oral Motion for Judgment of Acquittal as to Counts I and III.

## I.  APPLICABLE STANDARDS

Rule 29 provides that "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A judgment of

acquittal is appropriate "only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Plume*, 110 F.4th 1130, 1133 (8th Cir. 2024) (quoting *United States v. McDonald*, 826 F.3d 1066, 1072 (8th Cir. 2016)); *see also United States v. Workman*, 71 F.4th 661, 663 (8th Cir. 2023) ("We will reverse [a district court's denial of a defendant's motion for a judgment of acquittal] only if a reasonable fact finder could not have found all the elements of the offense beyond a reasonable doubt." (internal quotation marks and citation omitted)). At this stage, courts "do not weigh the evidence or assess the credibility of the witnesses; that is the province of the jury." *United States v. White*, 794 F.3d 913, 918 (8th Cir. 2015).

There are four elements to the crime of wire fraud affecting a financial institution: (1) the defendant voluntarily and intentionally participated in a scheme to defraud with knowledge of its fraudulent intent; (2) the defendant did so with the intent to defraud; (3) the defendant used or caused to be used an interstate wire communication in furtherance of or in an attempt to carry out some essential step in the scheme; and (4) the scheme affected a financial institution. *See* Eighth Circuit Manual of Model Jury Instructions (Criminal) 6.18.1343 (2025); *United States v. Burns*, 990 F.3d 622, 627 (8th Cir. 2021) ("Under § 1343, the government must prove (1) intent to defraud, (2) participation in a scheme to defraud, and (3) the use of a wire in furtherance of the fraudulent scheme." (internal quotation marks and citation omitted)).

The Court concludes that there is sufficient evidence[1] for a reasonable jury to find that the Government proved all four elements of Counts I and III beyond a reasonable doubt. Indeed, the

---

[1] Pursuant to Rule 29(b), when the Court reserves its decision on the motion for a judgment of acquittal made before the close of all evidence, the Court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). Here, the Court reserved its ruling on the defendant's initial motion at the end of the Government's case in chief, so the Court decides that motion based on the evidence presented during the Government's case in chief. Rule 29(c) provides for a motion for a judgment of acquittal that is made after a guilty verdict. Fed. R. Crim. P. 29(c). To the extent the defendant made such a motion after the jury returned its verdicts here, the Court denies that motion for the same reasons it denies the motion made at the close of the Government's case in chief.

jury returned a guilty verdict on all three charges after deliberating for approximately one and a half hours.

## II. ANALYSIS

### A. The First Element: Scheme to Defraud

First, the Government has presented sufficient evidence that the defendant participated in a scheme to defraud, as a reasonable jury could find that the defendant made false representations to BV Builders' customers in order to obtain funds from their construction loans. There was testimony from multiple customers, including Justin Niewohner and Joseph Bartu, that the defendant sent invoices to the customers requesting draws on their construction loans to be used for specified purposes, such as to pay for windows, footings, lumber, labor, or even to secure a spot on BV Builders' calendar and allow BV Builders to initiate the permitting process. A reasonable jury could find that these invoices were material, as customers testified that they approved the draw requests expecting the funds to be used for the identified purposes. Various customers also testified that despite drawing from their construction loans, BV Builders did little or no work on their builds. Customers further testified that subcontractors and suppliers placed construction liens on their properties for services or supplies that the customers believed BV Builders' draws had already paid for. The Government presented evidence that the defendant signed lien waivers on checks issued to BV Builders by its customers' lenders, and the Court admitted into evidence the construction liens filed against those customers. Along these lines, there is evidence that the defendant specifically represented to Joseph Bartu that no liens would be placed on Bartu's property and evidence of the lien that was subsequently filed against the property. Based on this evidence, a reasonable jury could find that the defendant voluntarily and intentionally participated in a scheme to defraud BV Builders' customers with knowledge of the scheme's fraudulent nature.

There is also sufficient evidence for a reasonable jury to find that the defendant participated in a scheme to defraud BV Builders' subcontractors and suppliers. The Government presented evidence from multiple witnesses that BV Builders obtained the services of subcontractors and suppliers and then did not pay them for those services, leading some of the subcontractors and suppliers to place construction liens on BV Builders' customers' properties. Given this evidence, the jury could reasonably conclude that the Government proved the first element of the charged offenses beyond a reasonable doubt.

### B. The Second Element: Intent to Defraud

The evidence is also sufficient for a reasonable jury to find that the Government proved the second element of the charged crimes: the defendant's intent to defraud. The Eighth Circuit Court of Appeals has explained that "[p]rovided the victims suffered some tangible loss—as they did here—the scheme itself often serves as evidence of a defendant's intent to defraud." *United States v. Hansen*, 791 F.3d 863, 867 (8th Cir. 2015) (cleaned up). In this case, a reasonable jury could conclude that the defendant possessed the intent to defraud BV Builders' customers, subcontractors, and suppliers based on the same evidence that supports the scheme to defraud. In other words, evidence that the defendant made false representations to his customers and their lenders to obtain funds from the customers' construction loans, that the defendant signed lien waivers but construction liens still ended up being filed against his customers, and that the defendant obtained services from subcontractors and suppliers but did not pay them is enough for the jury to reasonably find that the defendant acted knowingly and with the intent to deceive BV Builders' customers, subcontractors, and suppliers and that he did so with the intent to cause financial loss to others or bring about financial gain for himself and his company. Additionally, the Government presented testimony from multiple witnesses that the defendant frequently ceased communicating with his

customers, subcontractors, and suppliers when they sought answers or money from him. This evidence is sufficient to show that the defendant possessed the intent to defraud.

### C.  The Third Element: Interstate Wire Communication

The third element of the charged crimes merits a lengthier discussion based on the events at trial and the defendant's specific arguments in support of his Motion for Judgment of Acquittal on Counts I and III. As the Court has already mentioned, the third element the Government must prove is that the defendant used or caused to be used an interstate wire communication in furtherance of or in an attempt to carry out some essential step in the scheme. *See* 18 U.S.C. § 1343 (criminalizing the act of transmitting or causing to be transmitted "by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a scheme to defraud or a scheme to obtain money or property by false representations). The wire communication identified in Count I is an email sent or caused to be sent by the defendant from the email address ar@bvbuilders.us to Justin Niewohner and two employees of First Community Bank. The wire communication identified in Count III is an email sent or caused to be sent by the defendant from the email address ar@bvbuilders.us to Joseph Bartu and an employee of Jones Bank. Those emails were sent through the Google Gmail system.

### 1.  Testimony of Shelby Smith, Google Records Custodian

At the beginning of the day on Friday, January 30—the fifth day of the jury trial—and outside the presence of the jury, counsel for the defendant objected to the Government's intent to offer the testimony of a records custodian from Google. Counsel for the Government proffered that the witness, Shelby Smith, would testify that Google received a subpoena from the Government asking the company whether there were any Gmail servers in the state of Nebraska at the times relevant to Counts I and III of the Superseding Indictment. The Government's counsel further

6

proffered that Smith would testify that a search was conducted in the regular course of Google's

business and that the search revealed that there were no Gmail servers in the state of Nebraska at

the relevant times. Defense counsel objected to Smith's anticipated testimony, arguing that only an

expert witness could testify to the location of Gmail servers. The Court overruled defense counsel's

objection when he first made it and again when he renewed it when the Government called Smith

to the stand. [2]

On direct examination, Smith gave testimony that was consistent with the Government's

proffer. She testified that Google received a subpoena from the Government asking whether there

were "any servers which handled Gmail email traffic" located in the state of Nebraska between

September 1 and September 5 of 2023, as related to Count I, and on August 15, 2023, as related to

Count III. Filing 198 at 3–4. Over defense counsel's objection, Smith testified that a search revealed

---

[2] Defense counsel repeatedly argued that only an expert could testify that there were no Google Gmail servers in the state of Nebraska because only a top-level executive at Google could know whether there are any Gmail-configured servers in Nebraska. The Court overruled the defendant's objections and, relying on numerous cases reaching a consistent conclusion, held that an expert was not required to testify on this issue. *See, e.g.*, *United States v. Woods*, No. 5:17-CR-50010, 2017 WL 5892205, at *1 (W.D. Ark. Nov. 29, 2017) (permitting an employee to testify about the physical location of his company's servers and explaining that the "Court sees no reason why identifying the physical location of Endpoint Exchange's servers would require 'scientific, technical, or other specialized knowledge within the scope of Rule 702'" (quoting Fed. R. Evid. 701(c))); *United States v. Clinesmith*, No. 23-20063-01-DDC, 2026 WL 70347, at *4 (D. Kan. Jan. 9, 2026) (holding that the government satisfied the "use of interstate wires" element by "adduc[ing] testimony of a Charter Communications representative who testified that each email had to travel across state lines from the defendant's home in Kansas to servers in either Colorado or Pennsylvania"). Upon review of persuasive authority, the Court further concluded that a knowledgeable Google employee, even one disclosed as a "records custodian," could testify that there are no Gmail servers in Nebraska and that emails sent through Gmail pass through a Gmail server before reaching the recipient. *See, e.g.*, *United States v. Prince*, 333 Fed. Appx. 400, 402 (11th Cir. 2009) (per curiam) (upholding the admission of a T-Mobile employee's testimony that, based on his personal knowledge, the voicemails at issue were stored on servers in Atlanta and concluding that "[t]he jury was entitled to believe that testimony, which was sufficient to establish the interstate commerce element"); *United States v. Valdés-Ayala*, 900 F.3d 20, 33 (1st Cir. 2018) (concluding there was sufficient evidence to find the emails crossed state lines based on testimony from a representative of company that the defendant emailed stating that the company did not have an office in Puerto Rico, where the defendant was located, and based on testimony from a custodian of records for Microsoft who "testified that none of the email services operated by Microsoft (including hotmail) have servers located in Puerto Rico"). As the Court explains in the body of this decision, this evidence, if believed, is sufficient for a jury to reasonably find that the Government met its burden to prove the interstate commerce element.

that there were no Gmail servers in Nebraska for those dates. Filing 198 at 4. Smith's direct

examination concluded with the following exchange:

> Government Counsel: Are you familiar with how the basic Gmail traffic works?
>
> Witness: Roughly, yes.
>
> Q. Are -- If one person sends an email to another, does it have to go through the Google servers?
>
> A. I can't speak exactly to the path of the travel of a specific email. That's my assumption is that it would have to travel through a Gmail server at some point, yes.
>
> Q. Okay.
>
> Defense Counsel: Your Honor, I'm -- again, objection, Your Honor. She stated, "that's my assumption." She doesn't know.
>
> Court: I will allow the United States to continue laying foundation and then entertain an additional objection if there is one.
>
> Government Counsel: Okay. So for a Google email -- or for a person to -- to send or receive an email from a -- from a Gmail traffic, it'd have to go through the -- the Gmail servers; is that right?
>
> Witness: I believe so, yes.
>
> Q. And is that the reason why -- when you're asked are servers located in a specific place, that's essentially the reason; is that correct?
>
> A. Yes.
>
> Q. Okay. And so if I'm in Nebraska during those periods and I have a Gmail account and I send and receive an email from Gmail, would that communication necessarily have to leave the state?
>
> Defense Counsel: Objection, again, Your Honor. I think that's going beyond the records custodian's role.
>
> Court: Overruled. You may answer.
>
> Witness: Based on my understanding, yes, I believe the email would have to travel out of the state.

Filing 198 at 5–6.

8

On cross examination, however, defense counsel elicited testimony that Smith herself did not complete the search of Google's Gmail server records, but she relied on the work of her team to do the analysis. Filing 198 at 9. Defense counsel asked Smith, "Your testimony does not necessarily established -- establish that Google data necessarily crossed state lines," to which she responded, "I -- I don't believe so, no." Filing 198 at 10. Defense counsel also asked Smith whether she was "aware that Google has a data center in Papillion, Nebraska" to which she responded, "I am not aware of that, no." Filing 198 at 11.

On redirect examination, the following exchange occurred:

Government Counsel: And there was mentions of data centers and other things. Does Google have a wide variety of products and services that they offer?

Witness: Yes.

Q. And Gmail is one subset.

A. Yes.

Q. So a data center and Gmail are not necessarily the same thing.

Defense Counsel: Objection, again, going beyond the scope of her -- I mean, she's here as I --

Court: Overruled. Overruled. She can answer this question if she knows.

Witness: I don't know the difference between a data center and a server. I -- I do know that typically the server locations that we are looking at are in terms of Gmail servers.

Government Counsel: So your search was limited specifically to just the Gmail servers.

Witness: That's correct.

Q. Okay. And so you know that there was no Gmail -- specifically Gmail servers in Nebraska --

Defense Counsel: Objection.

Government Counsel: -- during that period?

9

Defense Counsel: Objection. Hearsay. She didn't perform the search.

Court: Overruled. You can -- you can testify if you know.

Witness: Yes. I -- I -- I reviewed the -- the response that we had to the search so I can speak to the authenticity of that and, no, we did not have any Gmail servers located in the state of Nebraska for the time frame specified.

Government Counsel: Okay. So if it's -- if -- Google has a wide variety of things. So another server, we don't know, that maybe that is the case but Gmail specifically is what you were focused on?

A. Correct, yes.

Filing 198 at 13–14. After defense counsel stated that Smith could not be released as a witness from the perspective of the defendant, the Court called a sidebar at the request of the Government. Defense counsel told the Court that "[t]here were clearly data servers in the state of Nebraska at the time this happened" and questioned whether Smith was telling the truth because she testified "that there weren't or [that she] doesn't know." Filing 198 at 15. Counsel for the Government responded that "[d]ata centers and Gmail servers are two different things." Filing 198 at 15. The Court explained that the jury could determine whether it mattered at all that Smith did not know there was a data center in Papillion, Nebraska.[3] Filing 198 at 16. The Court then asked the Government's attorney whether he believed Smith's testimony had satisfied the Government's burden to prove that the emails in Counts I and III had crossed state lines. Filing 198 at 17. Counsel for the Government responded in the affirmative. Filing 198 at 17. The Court permitted defense counsel to re-cross Smith and the Government to re-redirect her. The final question of the Government's re-redirect examination was, "And let's just back up and just take a big picture view of this just real basic. If I have a Gmail account and I send an email through my -- from -- like to or from Gmail, does it have

---

[3] Significantly, defense counsel did not offer any evidence of a Google data center in Nebraska.

to go through the Gmail servers?" Filing 198 at 21. Smith responded, "I don't know." Filing 198 at 21.

### 2. Proffered Testimony of FBI Special Agent Alexander Herman

At the end of the day on Friday, January 30 and before the Court adjourned for the weekend, the attorney for the Government stated his intent to call FBI Special Agent Alexander Herman to testify on Monday, February 2 to address the interstate wire communication element. Special Agent Herman was not disclosed as a witness in the case. The Government's counsel explained that Agent Herman would be able to testify that he understands how servers work as part of his job in the FBI's cyber division. Agent Herman would further testify that if a company has no servers in a state and that company is used to transmit an item, like an email, the item would have to travel through out-of-state servers before reaching the recipient. The Government proffered that Agent Herman's testimony could also include an analysis of the IP addresses in the "headers" of the relevant emails. According to the attorney for the Government, Agent Herman would be able to testify that the emails left the state of Nebraska based on the information contained in IP addresses. The attorney for the Government further noted that this is information that any FBI agent would know due to their training.

At the beginning of the day on Monday, February 2 and outside the presence of the jury, the Court initially stated on the record that it was inclined to permit Agent Herman to testify as a lay witness because his testimony would be based on underlying emails already admitted into evidence and because he would be applying his industry experience to those underlying emails and he would be subject to cross-examination. The Court did note, however, that the emails' header information could only be accessed through the original electronic form of the email—not the PDF documents admitted into evidence. The Court therefore asked the Government to confirm whether it had

disclosed the electronic forms of both emails to the defendant in discovery. The Court also granted defense counsel's request to voir dire Agent Herman before he would testify in front of the jury. The Court noted that it would make a final decision on the matter after it received a response from the Government as to whether the electronic versions of the e-mails had been produced and after the voir dire of the proposed witness out of the hearing of the jury. The Government then proceeded to call the remaining witnesses in its case in chief.

After the Government had called every witness except Agent Herman, the Court and the parties discussed Agent Herman's testimony again outside the presence of the jury. At this time, Counsel for the Government informed the Court that the Government's disclosures included the electronic form of the email in Count I, along with a header analysis of that email, but not the electronic form of the email in Count III. The Court then permitted defense counsel to voir dire Agent Herman before addressing the issue. During defense counsel's voir dire, Agent Herman testified there is nothing in an email header that gives a state name or a city name. He also testified that the time zone shown in the header reflects how the server recorded time, not where the sender was physically located. Agent Herman agreed with defense counsel that it would require specialized technical knowledge and access to open-source data outside of the email to determine anything further from an email header. He also testified that a layperson would not be able to say where an email went or where a sender or receiver was located just by looking at the header information. The Court then allowed the attorney for the Government to examine Agent Herman.

After hearing Agent Herman's proffered testimony, the Court precluded Agent Herman from testifying before the jury. The Court determined that Agent Herman's testimony would constitute expert testimony that was untimely disclosed and that allowing such testimony would prejudice the rights of the Defendant given the defense did not have a chance to know about it and respond to it.

12

*3. A Reasonable Jury Could Find the Government Proved the Third Element as to Counts I and III*

Defense counsel specifically argued for a judgment of acquittal on Counts I and III on the grounds that the Government did not meet its burden to prove that the relevant emails were transmitted in interstate commerce. The Court concludes that a reasonable jury could find that the Government proved this element for both counts beyond a reasonable doubt.

In considering a motion for judgment of acquittal, the Court does not "weigh the credibility of the witnesses or the evidence," as "[t]he jury has the sole responsibility to resolve conflicts or contradictions in testimony." *United States v. Louper-Morris*, 672 F.3d 539, 555 (8th Cir. 2012) (internal quotation marks omitted) (quoting *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010)). Clearly, there were contradictions in Shelby Smith's testimony by the time she left the witness stand: she testified on direct examination that it was her understanding that an email sent via Gmail during the time periods identified in Counts I and III would have to travel out of the state of Nebraska because there were no Gmail servers in the state, but she testified on re-redirect examination that she did not know whether an email sent through Gmail would have to go through Gmail servers. It is purely the province of the jury to decide what portion, if any, of Smith's testimony it believes. *See White*, 794 F.3d at 918 ("We therefore do not weigh the evidence or assess the credibility of witnesses; that is the province of the jury."). To that end, the Court instructed the jury that in deciding what the facts are, it may "believe all of what a witness said, or only part of it, or none of it." Filing 203 at 14. At the judgment of acquittal stage, it is enough that there is evidence for a reasonable jury to find that the emails identified in Counts I and III crossed state lines in the process of being sent. Smith's testimony on direct examination, if believed, is precisely such evidence. Although Smith did not testify to the exact "path of travel of a specific email," she testified

13

that there were no Gmail servers in the state of Nebraska at the relevant times. Filing 198 at 5. The Eighth Circuit has held that in a wire fraud case, "[a] jury may reasonably infer from circumstantial evidence that a telephone call was between parties in different States." *United States v. Lefkowitz*, 125 F.3d 608, 616 (8th Cir. 1997). The same principle applies here. Thus, even if Smith's direct testimony that she "believe[d] the email would have to travel out of the state" was not considered, her testimony that there were no Gmail servers in Nebraska is sufficient for the jury to reasonably infer that the emails sent via Gmail left Nebraska before reaching the recipients.

Moreover, the emails themselves were admitted into evidence without objection, and a jury could reasonably find that those emails were used in furtherance of or in an attempt to carry out an essential step in the scheme to defraud BV Builders' customers, subcontractors, and suppliers.

### D.  The Fourth Element: Affected a Financial Institution

The fourth element of the charged crimes also warrants a more detailed analysis based on the defendant's arguments for a judgment of acquittal. That element requires the Government to prove that the scheme to defraud affected a financial institution. Defense counsel argued at trial that the Government offered no evidence that the banks identified in the Superseding Indictment were financial institutions or that they were affected by the scheme to defraud.

The Court begins with the defendant's argument that the banks were not affected by the scheme to defraud and concludes that there is sufficient evidence to support a finding that First Community Bank in Count I and Jones Bank in Count III were so affected. The vice president of mortgage lending at First Community Bank testified that the bank issued a construction loan for the Niewohners and authorized draws on that loan at the defendant's request and with the Niewohners' approval. That same witness testified that it is a problem for the bank if funds are not used for their intended purpose and that the Niewohners had to extend their construction loan to deal with the

14

construction liens filed on their property. The executive vice president of lending at Jones Bank testified that BV Builders maintained an account at the bank that became significantly overdrawn, which was concerning to the bank. Furthermore, Joseph Bartu testified that he had a construction loan through Jones Bank that the defendant received draws on. Bartu also testified that, due to construction liens placed on his property, he was unable to convert his construction loan with Jones Bank to a 30-year mortgage. A jury could reasonably conclude based on this evidence that First Community Bank and Jones Bank were affected by the scheme to defraud.

The Court now turns to the defendant's argument that there is insufficient evidence showing that First Community Bank and Jones Bank were financial institutions. Defense counsel correctly pointed out during trial that 18 U.S.C. § 20 defines the term "financial institution" for the purposes of the wire fraud statute. Under the definitional statute and as relevant here, a "financial institution" includes "an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);" "a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;" and "a mortgage lending business (as defined in section 27 of this title) [4] or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974." 18 U.S. § 20(1), (4), (10). During his argument for a judgment of acquittal, defense counsel contended that the Government presented no evidence suggesting either bank fell within the definition of a "financial institution" because the Government did not offer (1) a copy of either bank's insurance certificate from the Federal Deposit Insurance Corporation (FDIC), (2) proof of payment of the insurance

---

[4] A "mortgage lending business" is defined as "an organization which finances or refinances any debt secured by an interest in real estate, including private mortgage companies and any subsidiaries of such organizations, and whose activities affect interstate or foreign commerce." 18 U.S.C. § 27.

premium by either bank, or (3) testimony of an official from either bank stating that the bank was insured by the FDIC. Defense counsel referenced *United States v. Rusan*, 460 F.3d 989 (8th Cir. 2006), which he said required the Government to offer one of those three forms of evidence to prove that a bank is a financial institution under 18 U.S.C. § 20. Counsel for the Government countered that there is sufficient evidence for a reasonable jury to find First Community Bank and Jones Bank were financial institutions because documents from both banks were admitted without objection and contain information that meets the definitions set out in 18 U.S.C. § 20. *See, e.g.*, Government Exhibit 7 at 1, First Community Bank Niewohner Loan Approval Email from Terrence Seawall 10/12/2022 (including a Nationwide Mortgage Licensing System (NMLS) number beneath Seawall's email signature); Government Exhibit 106 at 3, Jones Bank Bartu Construction Loan 04/24/2023 (including Jones Bank's NMLS identification number and Derek Tesinsky's NMLS identification number); Government Exhibit 117 at 1, Jones Bank Statements for BV Builders Account 2021 (indicating that Jones Bank is a "Member FDIC").

Defense counsel overextends *Rusan*. The crimes at issue in *Rusan* were bank robbery and bank larceny. *Rusan*, 460 F.3d at 990. As the *Rusan* court explained, one of the elements of both bank robbery and bank larceny is the bank's status as a federally insured institution. *Rusan*, 460 F.3d at 933. This is reflected in 18 U.S.C. § 2113, the statue criminalizing bank robbery and bank larceny. That statute prohibits certain conduct involving "any bank, credit union, or any savings and loan association." 18 U.S.C. § 2113(a), (b). The statute then defines "bank, credit union, or any savings and loan association" without any reference to 18 U.S.C. § 20. *See* 18 U.S.C. § 2113(f), (g), (h). All three definitions in 18 U.S.C. § 2113 specifically reference the insurance status of those institutions: a bank's deposits must be "insured by the Federal Deposit Insurance Corporation"; a credit union's accounts must be "insured by the National Credit Union Administration Board"; and

a savings and loan association's accounts must be "insured by the Federal Deposit Insurance Corporation." *Id.* The element of "insured status" is also reflected in the Eighth Circuit's model jury instructions for § 2113 crimes, as the model instruction requires the Government to prove that "the deposits of (name of bank, etc.) were then insured by (name insuring agency, e.g., the FDIC)." Eighth Circuit Manual of Model Jury Instructions (Criminal) 6.18.2113A (2025).

The *Rusan* court ultimately held that the government had presented sufficient evidence to establish that the bank was FDIC insured, but the circuit did caution that the government's evidence—a "photocopy of a plaque on display at the bank that notifies customers the bank is insured by the FDIC" and the testimony of a bank employee who had worked for the bank for over 31 years and who "testified that the bank was insured on the day of the robbery and that her knowledge of that status came through information disseminated from the bank"—was "approaching what [the court] would consider the bare minimum." *Id.* at 993–94. The *Rusan* court suggested that "the certificate of insurance in effect at the time of the offense, accompanied by proof of the premium payment for the same period offered through the testimony of a knowledgeable official from the bank, would more specifically (and easily) satisfy this element of the offense." *Id.* at 995.

The defendant asks the Court to apply *Rusan*'s "standard of proof of insured status" to his case and find that the Government did not meet its burden to prove that First Community Bank and Jones Bank were federally insured because the Government did not offer any of the forms of evidence identified in *Rusan*. The Court understands the defendant's argument and agrees that the Government certainly could have avoided this issue altogether by offering such evidence. However, the wire fraud charges in this case did not involve the same "insured status" element discussed in *Rusan*. Unlike bank robbery cases where the jury is specifically instructed that the Government must

prove that the bank's deposits were insured by the FDIC—and even unlike bank fraud cases where the jury is specifically instructed that the Government must prove that the bank is either insured by the FDIC or otherwise falls within the definition of a "financial institution" in 18 U.S.C. § 20—the jury in this case was only instructed that the Government must prove that the scheme to defraud affected a financial institution. *See* Eighth Circuit Manual of Model Jury Instructions (Criminal) 6.18.2113A, 6.18.1343, 6.18.1344 (2025); Filing 203 at 17 (Final Jury Instruction No. 11). The Court's instruction on this issue mirrored the model instruction and was given without objection from either party. Based on this unobjected-to instruction and based on the evidence admitted at trial, the Court concludes that the jury could reasonably find that the banks were financial institutions.

### III. CONCLUSION

For the foregoing reasons, the defendant's oral Motion for Judgment of Acquittal is denied as to Counts I and III of the Superseding Indictment. There is sufficient evidence for a reasonable jury to conclude that the Government met its burden to prove all four elements of both counts of wire fraud affecting a financial institution. The Court previously denied the motion as to Count II on the record. To the extent defense counsel made another oral motion for a judgment of acquittal on all three counts following the guilty verdict, this time pursuant to Rule 29(c), the Court denies that motion for all the reasons stated on the record and in this order. *See* Fed. R. Crim. P. 29(c). Accordingly,

IT IS ORDERED that the defendant's oral Motion for Judgment of Acquittal is denied as to Counts I and III of the Superseding Indictment. To the extent the defendant orally moved for judgment of acquittal pursuant to Rule 29(c) following the guilty verdicts in this matter, that motion is also denied for the reasons stated on the record and in this order.

Dated this 6th day of February, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge